CENTRAL & SOUTHERN MOTOR FREIGHT TARIFF ASSOCIATION, INC., et al., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

No. 84–1268.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 10, 1985.

Decided Nov. 22, 1985.

Elliott Bunce, with whom John W. McFadden, Jr., Kim D. Mann and Andrew J. Carraway, Arlington, Va., were on brief, for petitioners.

Richard J. Osterman, Jr., Atty., Interstate Commerce Commission, with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Robert S. Burk, Acting General Counsel, Ellen D. Hanson, Associate General Counsel, I.C.C., Catherine G. O'Sullivan and Frederic Freilicher, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents.

John Broadley, Robert S. Burk, Attys., I.C.C. and Barry Grossman, Atty., Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Before WALD, MIKVA and STARR, Circuit Judges.

STARR, Circuit Judge:

This petition for review arises from efforts of the Interstate Commerce Commission, pursuant to the Independent Offices Appropriation Act, 31 U.S.C. § 9701 (1982) (as amended), to update the fees charged for various services rendered by the Commission. The ICC's final decision, *Regulations Governing Fees for Services Performed in Connection with Licensing and Related Services*, 1 I.C.C.2d 60 (1984), adopted fees for 72 separate services. Petitioners, a number of motor carrier rate associations ("Associations") which function both as trade associations and as joint rate-setting authorities, challenge the fees imposed for processing and approval of four items: (1) rate association agreements; (2) amendments to rate association agreements; (3) requests for general rate increases; and (4) rate tariffs.

Although the underlying facts of this dispute are complex, the two principal issues before us can be simply stated. The first is whether the ICC may lawfully charge motor carriers the Commission's full costs of processing these filings, in the face of the motor carriers' contention that part or all of the identifiable benefits of the filings inure to the public at large rather than to the carriers. The second issue is whether the ICC properly computed its processing costs. As to the first issue, we conclude that in each instance the ICC's decision to impose fees sufficient to recoup its full costs was lawful. We also upheld in most respects the ICC's computation of costs. For reasons to be set forth, we remand the case to the ICC for further consideration and explanation of two cost items, namely, operations overhead and tariff processing.

**I**

The Independent Offices Appropriation Act (IOAA), passed in 1952, authorizes fed-

eral agencies to prescribe and collect fees for their services. The statute's express purpose is to make such services "self-sustaining to the extent possible." 31 U.S.C. § 9701(a) (1982). The IOAA describes only in the most general terms how this desideratum of agency self-sufficiency is to be accomplished; agencies are statutorily instructed to be fair in imposing any fee regime and to consider such factors as costs to the Government, the value of the service to the recipient, the public policy or interest being served, and "other relevant facts." *Id.* § 9701(b)(2)(A)-(D).

## A

In 1959, the old Bureau of the Budget (now, of course, part of the Office of Management and Budget (OMB)) provided administrative guidance to the agencies for implementation of the IOAA in Budget Circular No. A-25, "User Charges" (September 23, 1959). The Circular construed the IOAA as authorizing a "reasonable charge" to "each identifiable recipient for a measurable unit or amount of Government service or property from which he derives a special benefit," *id.* ¶ 3; the Circular further interpreted the IOAA as precluding a charge for services rendered "when the identification of the ultimate beneficiary is obscure and the services can be primarily considered as benefitting broadly the general public," *id.* ¶ 3(a)(2). The Circular stated that "[w]here a service (or privilege) provides special benefits to an identifiable recipient above and beyond those which accrue to the public at large, a charge should be imposed to recover the *full cost* to the Federal Government of rendering the service." *Id.* ¶ 3(a)(1) (emphasis added).

## B

In 1966, the ICC promulgated its first schedule of fees pursuant to the IOAA and Circular A-25. *Ex Parte No. 246, Regulations Governing Fees for Services,* 326 I.C.C. 573 (1966). A supplementary decision, 329 I.C.C. 814 (1967), effected some minor adjustments to the fee schedule. These 1966-67 decisions imposed fees for 34 services. Included in that schedule were fees for analysis and approval of rate association agreements. Under federal law, of course, a rate association may operate with antitrust immunity only if the Commission, applying detailed statutory criteria, approves the association's agreement and amendments. 49 U.S.C. § 10706(b) (1982). In contrast to rate association agreements, the ICC under the 1966-67 decisions imposed no fee for filing of either rate tariffs or general rate increases, the latter of which effectively permit a carrier to file multiple tariffs at once. Federal law requires carriers to have on file with the Commission up-to-date tariffs detailing the rates they will charge for all their services. 49 U.S.C. § 10761(a).

The fees imposed by the 1966-67 decisions were, by design, generally lower than the full costs of Commission services. This was so for three reasons. First, fees were set at approximately 50 percent of the ICC's costs as estimated during a four-week internal study. The 50 percent figure was utilized to take into account benefits accruing to the general public by the ICC's providing these services. Second, fees were capped at $200. Thus, although the Commission's cost study indicated, for example, a cost of $2,019 for processing a rate bureau agreement, and $499 in costs for processing an amendment to an approved agreement, the Commission charged only the $200 maximum for these two services. Finally, as we already observed, the Commission charged no fees for such services as filing of tariffs and general rate increases.

In 1971, the Commission revised the 1966-67 schedule in two respects, namely by increasing fees for most services and imposing fees for ten additional services which were previously furnished gratis. *See* 339 I.C.C. 555 (1971). This decision was rendered, at least in part, in response to Congressional sentiment that the Executive Branch was, in general, not receiving sufficient compensation for its various services. *See* S.REP. No. 1375, 90th Cong., 2d Sess., July 9, 1968, *cited at* 339 I.C.C. at

557. The ICC's 1971 decision, however, perpetuated the agency's general policy of charging 50 percent of estimated costs. On the other hand, the $200 ceiling was eliminated, and fees for rate association agreements and amendments to such agreements were both increased to $300. *Id.* at 577. Although initially proposing a fee of $.50 per page for tariffs, the ICC, in the wake of public comments, abandoned that proposal, stating that "at the present time, we are reluctant to impose a fee for filing tariff pages" because the benefit to a carrier which files a tariff "is rather remote or obscure." *Id.* at 562. No fee was considered for general rate increases.

**C**

Thus matters stood when litigation erupted in the mid-1970s over the fees charged by various administrative agencies. Between 1974 and 1976, the Supreme Court and this court had occasion to address a number of challenges to agency fee schedules. In two cases, the Supreme Court determined that certain fee schedules and annual assessments were overbroad, inasmuch as the fees represented attempts by the agencies to recover from regulated industries the full costs of the agencies' regulatory apparatus. The Court concluded that such fees or assessments went beyond the recovery of costs for benefits conferred upon identifiable beneficiaries; such charges, the Court reasoned, were more conceptually akin to taxes, which could, of course be levied only by Congress. *National Cable Television Ass'n v. United States (NCTA I)*, 415 U.S. 336, 340–44, 94 S.Ct. 1146, 1148–50, 39 L.Ed.2d 370 (1974); *Federal Power Comm'n v. New England Power Co.*, 415 U.S. 345, 349–51, 94 S.Ct. 1151, 1154–55, 39 L.Ed.2d 383 (1974); *see also National Ass'n of Broadcasters v. FCC*, 554 F.2d 1118 (D.C.Cir.1976) (applying *NTCA I* to strike down FCC fee schedule). *New England Power*, moreover, expressed general approval for the interpretation of the IOAA embodied in Circular A–25, *see* 415 U.S. at 349–51, 94 S.Ct. at 1154–55, although the Court did not specifically examine the ques-

tion whether an agency could recover the *full* costs of providing specific services to identifiable beneficiaries.

The full-cost issue was subsequently addressed in the setting of a fee regime for common carriers and equipment manufacturers imposed by the Federal Communications Commission. In *Electronic Industries Ass'n v. FCC*, 554 F.2d 1109 (D.C.Cir. 1976), this court held that the FCC was "not prohibited from charging an applicant or grantee the *full cost* of services rendered to an applicant which also result in some incidental public benefits." *Id.* at 1115 (emphasis added); *accord Mississippi Power & Light Co. v. NRC*, 601 F.2d 223, 229 (5th Cir.1979) (agency "may recover the *full cost* of providing a service to a private beneficiary, regardless of whether that service may also benefit the public") (emphasis in original); *see also National Cable Television Ass'n, Inc. v. FCC (NCTA II)*, 554 F.2d 1094, 1104 (D.C.Cir. 1976) (approving FCC policy of recovering costs associated with processing of applications and tariff filings, but requiring FCC to state its cost basis more explicitly). *Electronic Industries* also rejected the sweeping argument advanced by certain common carriers that the FCC could not impose *any* fee for tariff filings. Such fees, according to the *Electronic Industries* court, were justified because common carriers are required by statute to file tariffs in order to operate in the first instance, "and the FCC is entitled to charge for services which assist a person in complying with his statutory duties." 554 F.2d at 1115.

**D**

Not surprisingly, this set of decisions was deemed to cast considerable doubt upon the ICC's policies of recovering only 50 percent of its costs and refusing to impose fees for tariffs and general rate increases. To bring these legal developments with respect to its sister agencies directly home to the ICC, the General Accounting Office (GAO) in 1983 published a

review of the ICC's user fee policies, concluding as follows:

ICC is authorized to charge identifiable beneficiaries the full cost of special services. This is not being done because (1) ICC is not charging fees for all services provided, (2) the current fees for those services for which charges are made are outdated, and (3) ICC has established a policy whereby fees are set at 50 percent of the cost of providing the service. As a result, services performed by ICC are not self-supporting to the full extent possible.

GAO Report RCED 83–55, "Interstate Commerce Commission Should Revise Its User Fee Program" (1983), at 14. The GAO specifically identified tariffs and general rate increases as items that should be included in the agency's fee schedule. *Id.* at 18 (Appendix II). That same year, Congress expressed its concern over ICC user fees by withholding $8 million of the Commission's appropriation "until the Commission has published final rules updating its user fee program." Pub.L. No. 98–78, 97 Stat. 453, 468 (1983).

Stirred to action by these developments, the Commission immediately established an agency-wide User Fee Task Force to consider the GAO recommendations. The Task Force identified over 75 separate items for inclusion in the fee schedule, including the 44 items in the existing schedule and the 26 additional services identified in the GAO Report. The Task Force conducted a 13-week "time and motion study" of costs associated with these various items.

On February 17, 1984, the Commission issued a Notice of Proposed Rulemaking ("NOPR"), 49 Fed.Reg. 6118, proposing to amend the agency's user fee schedule based upon the Task Force recommendations. Both the fee items and the level of the proposed fees were addressed at length in the NOPR. Confessing that it had in the past arbitrarily allocated 50 percent of the cost of its services to the public, the Commission explained its abandonment of that policy as follows:

We do not believe [the 50 percent] formula is appropriate today. The guidance that the courts have given us in this area shows that an agency should as a general rule set fees to recover the full costs of processing the application or petition. We believe that to fulfill our responsibility under IOAA, and [Circular] A–25 policy we must set our fees at the full cost recovery levels unless a specific A–25 policy would allow a lesser assessment.

*Id.* at 6121. The NOPR did, however, propose a few exceptions to the principle of full cost recovery, as, for example, with major rail transactions, where the ICC found that 25 percent of the agency's effort was attributable to general public-interest considerations, not redounding to the specific benefit of the applicants themselves. *Id.* at 6121–23.

### E

The proposed fee levels embodied in the NOPR primarily reflected direct labor costs, with additions for overhead and miscellaneous expenses such as environmental assessments and publication in the *Federal Register* and *I.C.C. Register*. *Id.* at 6121. The direct labor costs were based upon the 13-week time and motion study and on special studies and interviews in instances where the particular service was not performed during the 13-week study period or where the sample obtained during that period did not appear to be representative of filings with the agency. *Id.* at 6119. The Commission also indicated that some of the labor cost data were questionable and subject to adjustment based on further study by the Task Force. *Id.* at 6120.

Overhead costs were calculated as a percentage of direct labor costs, and added to the direct labor costs for each item to calculate "fully distributed" costs. Overhead costs were broken down into three components. The first was a 46.3 percent figure for governmental fringe benefits, including leave and holidays (20.0 percent), retirement and disability (20.4 percent), and health insurance, life insurance and social security (5.9 percent). All of these percent-

ages were based on OMB Circular A–76. The second component was operations overhead, calculated at 10.82 percent. This figure reflected the cost of supervision by upper-level supervisors such as bureau and office heads.[1] The third component was General and Administrative ("G & A") costs, calculated at 9.10 percent, based on the Commission's General and Administrative expenses for fiscal year 1983.

### F

Following publication of the NOPR, the Commission received 60 comments on this proposed scheme. Among the comments were those of petitioners here, the motor carrier rate associations. As we previously observed, petitioners objected to four of the proposed fees: (1) applications for approval of non-rail rate association agreements, for which the NOPR proposed a fee of $7,110; (2) applications to amend non-rail rate association agreements, for which the NOPR likewise proposed a fee of $7,110; (3) requests for non-rail nationwide or regional general rate increases or major rate restructurings, for which a fee of $3,650 was proposed; and (4) the filing of tariff and rate schedules, for which a fee of $8 per tariff was proposed. *Id.* at 6125–26.

On May 1, 1984, the Commission issued its final decision on the fee schedule. The decision opened with a discussion of the applicable legal guidelines for establishing fees. 1 I.C.C. at 63–64. Relying upon *Electronic Industries,* the ICC addressed the comments which objected to various fees on the grounds of general public benefit. The Commission explained: "[T]he fact that the general public may also benefit, directly or indirectly, from the Commission's regulatory activities does not limit the Commission's authority to charge a fee to the recipients of services provided by it." *Id.* at 65. Then, for each fee, the Commission specifically identified the service or benefit for which it was entitled to reimbursement. 1 I.C.C.2d at 66–71. With few

exceptions, the Commission adopted in its final decision the reasoning set forth in the NOPR. The agency did, however, make a number of adjustments to the proposed fees, based principally on modifications of estimated agency costs. The ICC increased the filing fee for rate association agreements to $7,600, but markedly decreased the fee for amendments to such agreements to $3,500 for "significant amendments" and to a modest $27 for "minor amendments." The Commission also increased the fee for general rate increases and major rate restructurings to $4,200 and decreased the fee for tariffs to $4 each.

### II

Soon thereafter, the Associations filed a petition for review in this court, challenging the four fees they had questioned in their comments to the ICC. Petitioners raise a number of objections, both to the reasoning and cost calculations specific to these four fees, and to the overhead cost estimates underlying the entire fee schedule.

Petitioners challenge the fee for approval of rate association agreements on two grounds. *First,* the Associations complain that the Commission failed adequately to explain or justify the dramatic fee hike for this category of service from $300 to $7,600. The Associations maintain that the Commission's determination of the fee was "arbitrary" and "haphazard," as illustrated, they say, by the allegedly inconsistent treatment of the case study on which the fee apparently was based and by the computation of the supervisory-hours figure employed in the computation. The arbitrariness and haphazardness of the fee calculation is also illustrated, they further argue, by the Commission's alleged failure to exclude that portion of its costs attributable to the processing of protests, (i.e., the agency staff resources devoted to analyzing objections to proposed agreements). *Second,* the Associations contend that the

---

**1.** This cost, however, was not included as part of the direct labor costs developed during the 13-week study.

Commission improperly and without explanation abandoned its long-standing policy of allocating to taxpayers 50 percent of the cost of processing rate association agreements. Petitioners argue that the processing of such agreements confers valuable benefits upon the general public, independent of the benefits conferred upon the Associations themselves. The Commission should therefore be required, petitioners maintain, to allocate a portion of these costs to the public for the same reasons that the Commission's 1984 Fees Decision so allocated a portion of the costs of *other* Commission services. The Associations also appear to argue that abandonment of the 50-percent rule is unwarranted, inasmuch as the benefits conferred upon the Associations by the ICC's processing of association agreements are, in their view, rather marginal.

The Associations mount a similar challenge to the $3,500 fee for processing significant amendments to rate association agreements.[2] Petitioners first contend that this fee was "set in a capricious manner," as illustrated by the following indicia of caprice: the use in the NOPR of a "dated" and "highly speculative" four-year-old case study; a discrepancy between the NOPR and the final decision as to whether the fee was based upon this study or upon "staff interviews;" and the Commission's failure to deal explicitly with the costs of protests. Here too, the Associations maintain that some part of the cost of processing these amendments should be allocated to the public.

Moving beyond rate association agreements and amendments, petitioners launch a comprehensive attack against the Commission's decision to impose a $4 fee for filing tariffs. The Associations argue that no fee is warranted for the following reasons: such filings provide, at best, a minimal benefit for the filing carrier; tariff filings produce substantial, independent benefits for the public; and the Commission, in petitioners' view, did not sufficiently explain its departure from its earlier

practice of charging no fee for such filings. Petitioners further contend that even if some fee is warranted, the $4 fee imposed by the Commission was arbitrary, as illustrated by what the Associations characterize as an unexplained reduction in the fee as originally proposed in the NOPR ($8 per tariff) and by the Commission's method of computing its costs. Under that computational method, the total costs of the Tariff Examining Branch were estimated over a one-month period, then discounted by 30 percent, and, finally, divided by the number of tariffs actually handled during the period.

The Associations' attack on the $4,200 fee for processing general rate increases and major rate restructuring parallels to some extent their challenge to the tariff filing fee. They allege that the Commission has not sufficiently explained its departure from the previous practice of charging no fee whatever for this service; they similarly urge that the processing of such filings confers no benefit upon carriers, but rather, benefits the public and the ICC itself by simplifying and expediting changes in large numbers of rates. Petitioners further contend that, even if their members do derive some benefit from such filings, the Commission should allocate part of the costs of such filings to the public.

Finally, the Associations sharply criticize the overhead percentages employed by the Commission in calculating all of the fees. Specifically, the ICC applied OMB Circular A-76 to estimate certain overhead costs even though, according to the Associations' interpretation, the Circular expressly states that it is *not* to be so applied. The ICC, in petitioners' view, failed to provide an independent justification for its borrowing of the Circular's percentages, that is, the agency does not show that certain percentages contained in the Circular are accurate when applied to the Commission. The Associations also challenge the Commission's G & A expense calculations, contending that the Commission failed adequately to explain its departure from past method-

---

**2.** Petitioners do not challenge the $27 fee for approval of minor amendments.

ology and did not adequately articulate the basis upon which it allocated certain portions of these expenses to the public. The Associations also fault the Commission's calculation of operations overhead expenses because that calculation, according to petitioners, erroneously assumes that the cost of lower-level labor supervision, as estimated during the 13-week study, is identical to the cost of middle-level supervision by bureau directors, office heads, and their staffs.

## III

Inasmuch as the fee schedule at issue here is an agency rule promulgated pursuant to express statutory authority, the scope of our review is narrow. This court is obligated to uphold the ICC's fees unless they are found to be wrbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *See* Administrative Procedure Act, § 10(e), *codified at* 5 U.S.C. § 706(2)(A) (1982). Because Congress has expressly delegated to the ICC the responsibility for setting these fees, the ICC in exercising that authority "is at the zenith of its powers;" the ICC's fees, therefore, "are entitled to more than mere deference or weight." *American Trucking Assn's, Inc. v. United States,* 627 F.2d 1313, 1320 (D.C.Cir.1980) (quoting *Batterton v. Francis,* 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977)). Under settled principles, we are not to substitute our own judgment for that of the agency. *E.g., Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). Rather, we must ascertain whether the ICC's fees were based upon a consideration of the relevant factors and whether the ICC committed any clear errors of judgment. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823; *Truck Transport, Inc. v. ICC,* 631 F.2d 1023, 1026 (D.C.Cir.1980).

Mindful of these broad principles, we turn first to examine whether it was appropriate for the ICC to set fees calculated to recoup the *full* costs of the four services at issue here. We then analyze whether the ICC properly calculated its costs of providing each of the four services.

### A

Although the IOAA itself provides little specific guidance on assessing the propriety of user fees, the Supreme Court and this court have developed pertinent principles, which may be briefly summarized. As a general matter, an agency may charge a fee for a *specific* service that confers a special, "private benefit" on an *identifiable* beneficiary. *See New England Power, supra,* 415 U.S. at 349, 94 S.Ct. at 1154 (quoting with approval Circular A–25). This is so regardless of the incidental public benefits produced by the service. *NCTA II, supra,* 554 F.2d at 1103. To be legally cognizable, the private benefit must be predicated upon something other than the mere fact of regulation or the adoption of some practice of merely general benefit to the industry as a whole. *Id.* at 1097; *see also New England Power, supra,* 415 U.S. at 350, 94 S.Ct. at 1154 (quoting with approval Circular A–25 to the effect that agencies should not charge for services "when the identification of the ultimate beneficiary is obscure").

The magnitude of the fee is limited only by three constraints. First, the fee may not exceed the agency's cost of providing the service. *NCTA II, supra,* 554 F.2d at 1104, 1107. Second, the fee must be reasonably related to and may not exceed the value of the service to the recipient, whatever the agency's costs may be. *Id.* at 1106 & n. 43. Finally, when the specific agency activity in question produces an *independent* public benefit, the agency must reduce the fee that it would otherwise charge by that portion of the agency's costs attributable to that public benefit. *See NCTA I, supra,* 415 U.S. at 343, 94 S.Ct. at 1150; *Electronic Industries, supra,* 554 F.2d at 1115. To borrow an exam-

ple from *Electronic Industries,* if the Federal Communications Commission, which is required to test and inspect electronic devices to determine whether they will create "harmful interference" with existing communications networks prior to granting regulatory approval for those devices, simultaneously expended agency funds in testing the devices for *safety,* the FCC could not charge applicants the costs of safety inspections and would be required to reduce the fee it would otherwise impose by at least the incremental cost of the safety inspections. *See* 554 F.2d at 1115.

These general principles, enumerated in existing decisional law, taken together suggest that an agency may recover the full costs of providing a service when the following conditions are met: (1) the agency has identified the specific agency activity or activities for which the fee is being assessed; (2) the service produces a special, private benefit; (3) the value of that private benefit is reasonably related to the fee; (4) the benefit accrues at least in part to an identifiable private beneficiary and not merely to the industry as a whole; and (5) the service in question produces no independent public benefit.

### 1. *Rate Association Agreements and Amendments*

█ Application of this analysis to the Commission's fees for processing rate association agreements and amendments to such agreements persuades us that the ICC may appropriately recover the full costs of providing these services. It is undisputed that the ICC has satisfied the first condition by explaining the service it provides in evaluating these agreements and amendments. *See* 49 Fed.Reg. at 6130, 1 I.C.C.2d at 106. The Associations also admit that the second and fourth conditions are satisfied. *See* Brief for Petitioners at 34 ("Petitioners recognize that applicants for [rate association agreement] approval receive some benefit, which until now the ICC has determined to be 50 percent."). They contend, however, that the third condition, having to do with the value of the private

benefit, and the fifth condition, pertaining to public benefits, have not been satisfied.

We cannot agree. The private benefits of ICC approval of rate association agreements and amendments are both clear and substantial. As we previously observed, rate associations can receive limited antitrust immunity only if their agreements are approved by the ICC under certain statutory criteria. 49 U.S.C. § 10706(b)(2) (1982) (as amended). As the Commission's final decision stated, "[p]arties to approved agreements receive the direct benefit of being able to collectively set rates with immunity from antitrust law. This is a special privilege not shared by the public at large." 1 I.C.C.2d at 106 (citing *Mississippi Power, supra,* 601 F.2d at 229). The privilege of operating collectively cloaked with antitrust immunity is obviously of enormous value; even if one adopts a benign view of rate bureau activities and assumes that the bureaus do not use their mantle of antitrust immunity to establish monopolistic prices, the ability to set rates collectively nonetheless permits association members to earn larger, or at least more stable, profits than they could in the absence of joint rate-setting. Indeed, a substantial purpose of the 1948 statute permitting the ICC to grant antitrust immunity was to help prevent the kind of "devastating competition" that, it was feared, might occur in the transportation industry in the absence of rate agreements. *See, e.g.,* 93 CONG.REC. 6604 (1947) (comments of Senator Saltonstall on Reed-Bulwinkle Act, later codified at 49 U.S.C. § 10706 (1982)). Absent antitrust immunity, rate bureaus and their members would naturally have to forego the significant benefits of collective ratemaking or, alternatively, face the substantial litigation expenses and possible penalties associated with private or Government antitrust actions. In a word, the fee imposed by the ICC for approval of association agreements and amendments represents a trivial percentage of the monetary value of antitrust immunity.

The Associations nonetheless contend that the services rendered by the ICC in evaluating and approving rate association

agreements and amendments are of minimal value to them. Petitioners assert that "the ICC's efforts, if any, on behalf of applicants [for approval of rate association agreements and amendments] are *merely* to verify that the application meets the specific requirements imposed by statute and regulation." Brief for Petitioners at 34 (emphasis added). We disagree. The Associations substantially understate the significance of the ICC's function. Under the statute, rate associations cannot receive antitrust immunity without evaluation and approval of rate association agreements by the ICC. It is highly doubtful, moreover, that Congress would grant such immunity without an examination of association documents having been conducted by a government agency. All the benefits of antitrust immunity, therefore, hinge upon the ICC's evaluation and approval process. Those ICC activities are thus of substantial, direct value to the Associations.

Petitioners expend considerably more energy on the argument that a substantial portion of the ICC's costs should be allocated to the public because the ICC's evaluation and approval process produces significant, independent public benefits. *See* Brief for Petitioners at 30–34, 39; Reply Brief for Petitioners at 5–9. Petitioners interpret the IOAA and relevant case law as imposing the following test for determining whether an agency should allocate some of its costs to the public:

[I]f the agency's service benefits the recipient primarily and if the benefit to the public is *only incidental*, the agency may charge the full cost of the service to the recipient; conversely, if the benefit to the public is *greater than incidental*, the agency must allocate its costs between the recipient and the public and must reduce the recipient's fee accordingly.

Brief for Petitioners at 33–34 (emphasis added). That is, if the public benefit is slight, the agency need not allocate any of its costs to the public; otherwise it must allocate its costs between the recipient and the public. Petitioners then point to two non-Association benefits of rate bureau—the orderly publication of tariffs and allowing meaningful shipper participation in ratemaking—*see* Brief for Petitioners at 31—and argue that these benefits are substantial and that the ICC is therefore required to allocate a portion of the costs of processing rate bureau agreements and amendments to the taxpayers.

This argument fails for two reasons. First, petitioners' proposed test for determining when an agency must allocate a portion of its costs to the public is incorrect. The proper test, as we have seen, is whether the agency activity at issue produces a public benefit that is independent of the private benefit upon which the agency properly relies in assessing the fee. *See supra* p. 729. Accordingly, whether an agency must allocate a portion of its costs depends not so much on the *magnitude* of the benefits to the public, as petitioners suggest, but rather on the *nature* of the public benefits and on their relationship to the private benefits produced by the agency action.[3] What flows from this is the

---

**3.** Contrary to petitioners' argument, Reply Brief for Petitioners at 8–9, the term "incidental," as used in *Electronic Industries,* is the opposite of "independent." In *Electronic Industries,* we stated:

[T]he FCC can include in the cost basis of its fees only those expenses which the agency incurs to confer value on the payor.... Expenses incurred to serve some independent public interest cannot ... be included in the cost basis for a fee, although the Commission is not prohibited from charging an applicant or grantee the full cost of services rendered to an applicant which also result in some incidental public benefits.

554 F.2d at 1114–15 (emphasis in original). In describing the difference between "incidental" and "independent" public benefits, the court provided a hypothetical example, discussed above, *see supra* p. 729, which clearly indicates that the court considered "incidental" and "independent" as antonyms:

[I]f the [FCC], in granting an equipment type approval under 47 U.S.C. § 302(a) (1970) and 47 C.F.R. § 2.803 (1975), is required to incur expenses for testing or inspection, such expenses can be charged in full to the applicant. These activities have undisputed private benefits although they may also create incidental public benefits as well. But, if the agency

following principle: If the asserted public benefits are the necessary consequence of the agency's provision of the relevant private benefits, then the public benefits are not independent, and the agency would therefore not need to allocate any costs to the public.

This principle, we believe, fully comports with the IOAA, because the agency is thus required to determine in each instance whether its activities produce a public benefit of the kind that can justify an allocation of costs to the public. *See* 31 U.S.C. § 9701(b)(2)(C) (requiring agency to consider· "public policy or interest served"). This principle is also consistent with *NCTA I,* for it recognizes that some of the costs of agency activity should, in appropriate cases, be allocated to the public. *See NCTA I, supra,* 415 U.S. at 343, 94 S.Ct. at 1150. This approach is, moreover, faithful to the hypothetical example discussed in *Electronic Industries.* In that example, the FCC could easily provide the relevant private benefit—testing and inspection of equipment for compatibility with the existing communications system—without examining the equipment to see whether it meets standards for consumer safety. The public benefit—a safer product—was therefore not the necessary or primary result of the agency's provision of the private bene-

fit. For this reason, the public benefit was independent of the private benefit. *See Electronic Industries, supra,* 554 F.2d at 1115.[4]

Applying this principle to the two public benefits alleged by the Associations, it is clear that neither is independent of the private benefit discussed above, namely, the privilege of operating with antitrust immunity. The first alleged benefit, the orderly publication of tariffs by rate bureaus, is a direct consequence of antitrust immunity. Absent immunity, such compilation and dissemination of rate information would subject the Associations and their members to severe antitrust risk.[5] For similar reasons, shipper participation in ratemaking is not an independent public benefit. Indeed, under 49 U.S.C. § 10706(b)(3)(B)(v), a rate bureau must permit shipper participation in ratemaking in order to receive antitrust immunity.[6]

At an even broader level, a strong connection exists between the private benefit—antitrust immunity—and the alleged public benefits—orderly publication of tariffs and shipper participation in ratemaking—at issue here. The latter are public benefits only in the sense that they mitigate somewhat the risk that rate associations might abuse their antitrust immunity by charging monopolistic or discriminatory

---

were to engage in further activity to determine whether a piece of equipment which has already been found to have no potential for creating "harmful interference" under Section [302(a) ] meets standards for consumer safety it would be doing so to satisfy some independent public interest, and the charge for these additional expenses could not be included in fees imposed on equipment owners. Although there may be some private benefit in safety testing, it is not a part of the service the agency must render to the manufacturer in order for him to comply with the statute: *the additional tests serve an independent public interest, with only incidental private effects. Id.* at 1115 (emphasis added) (footnote omitted).

**4.** Petitioners' reliance in this respect upon *New England Power, supra,* and *Public Service Co. of Colorado v. Andrus,* 433 F.Supp. 144 (D.Colo. 1977), is misplaced. The issue in the portions of these opinions cited in petitioners' briefs was whether there was any private benefit *at all,* not whether some portion of the costs involved in providing that private benefit should be allocat-

ed to an independent public benefit. *See NCTA II supra,* 554 F.2d at 1097 (characterizing issue in *New England Power* ); 433 F.Supp. at 152–53.

**5.** *See, e.g., United States v. Container Corp.,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969) (exchange of price information had anticompetitive effect and therefore violated section 1 of the Sherman Act); *American Column & Lumber Co. v. United States,* 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921) (holding unlawful an "open competition plan" for hardwood manufacturers, which included, among other things, exchange of price information).

**6.** 49 U.S.C. § 10706(b)(3)(B)(v) provides, "[U]pon request, the organization must ... admit any person to any meeting at which rates or rules will be discussed or voted upon, and must divulge to any person the vote cast by any member carrier on any proposal before the organization."

prices. Shipper participation in ratemaking imposes some direct constraints on the ability of rate bureaus to raise prices; publication of tariffs filed pursuant to rate bureau agreements has the further advantage of allowing individual shippers more easily to monitor compliance with these rates. Filings related to rate associations, then, should be seen as conditions imposed in return for permission to engage in a type of activity—participation in rate bureaus immune from the antitrust laws—that produces significant benefits for the carriers but is fraught with danger for the public. The mitigation of such danger should not, in itself, be considered an independent public benefit.[7]

2. *Tariffs and General Rate Increases*

Petitioners also contend that the Commission should impose no charge whatever for tariff filings and general rate increases and that, even if some fee is permissible, the ICC is obliged to allocate some portion of its costs to the public. Specifically, petitioners contend that the Commission has failed in this respect to satisfy the second and fifth requirements discussed above at p. 730; in their view, the ICC's processing of tariffs and general rate increases produces no special, private benefits, and, even if these activities do produce such benefits, they also produce independent public benefits.

We disagree. In our view, these two conditions have been satisfied; the requirements to recover the full costs of processing these filings was therefore not arbitrary or capricious. We discuss each condition in turn.

Contrary to petitioners' assertions, the ICC fully explained the abandonment of its early policy of imposing no fees for these services. With respect to tariffs, it is true that the ICC, in its 1971 fees decision, declined to impose a fee for tariffs on the ground that "the benefit to the carrier filing a tariff is rather remote or obscure. It is of definite benefit to the general public and to opposing carriers." 339 I.C.C. at 562. The Commission, moreover, acknowledged in its 1984 final decision that the tariff fee "is the most controversial item that we have included in our fee list." 1

---

**7.** Petitioners attack the Commission's revocation of its 50 percent approach on two additional grounds. First, they contend that the Commission failed adequately to explain the change in policy. *See* Brief for Petitioners at 31. We find the Commission's explanation for its change in policy to be entirely adequate. As already noted, decisions of the Supreme Court and of this court between 1974 and 1976 cast considerable doubt upon the Commission's earlier fees decisions and, in particular, established the propriety of recovering the full cost of agency services when the other conditions discussed above were met. *See supra* p. 725. The Commission's NOPR clearly explained that the abandonment of the 50-percent rule was due to these developments in the law. *See supra* p. 726.

Petitioners' other argument is that the Commission arbitrarily continued to allocate a portion of the costs of *other* Commission services to the public. *See* Petitioners' Brief at 35. We also find this argument lacking in merit. The fees to which petitioners refer are fees for major rail transactions, which the Commission set at 25 percent of the Commission's costs. *See* 49 Fed.Reg. at 6122. The Commission explained that 50 percent of the costs of reviewing major rail transactions is "attributable to directly related or responsive applications" by non-parties. *Id.* Petitioners do not dispute the propriety of reducing the fee to account for this cost. What petitioners do dispute is the Commission's decision to allocate an additional 25 percent of its costs to "the general public interest." *Id.*

The Commission, however, explained the basis of its 25 percent "public interest" allocation by pointing to specific public benefits produced by its consideration of major rail transactions:

Major transactions involve the merger of at least two class I railroads. In such cases the Commission must consider, among other matters, the effect of the proposed transaction on the adequacy of transportation service to the public and the interest of carrier employees. See 49 U.S.C. 11344(B).

*Id.* These benefits would seem to be independent of the benefit—ensuring that the merger does not violate antitrust standards—provided to the merging parties by the Commission's review process. The Commission need not consider such matters as "adequacy of transportation service to the public" or "the interest of carrier employees" as part of its antitrust review. Hence, we are unable to conclude that the 25 percent allocation was arbitrary, or that this allocation was inconsistent with the Commission's refusal to allocate to the public a portion of the costs of reviewing rate association agreements and amendments.

I.C.C.2d at 86. However, the ICC clearly explained why it was abandoning its previous policy, relying specifically upon the following language from *Electronic Industries*: "[Tariff filings] are required by statute, and the FCC is entitled to charge for services which assist a person in complying with his statutory duties." *Id.* at 66 (quoting 554 F.2d at 1109). The Commission reasoned that, in light of this holding with respect to FCC tariffs, which are indisputably similar to the tariffs at issue here, "there can be no serious question regarding the validity of imposing a user fee on the filing of tariffs." *Id.*

Although we need not endorse the ICC's sweeping view that a statutory filing requirement is *always* sufficient in and of itself to satisfy fully the private-benefit test, we believe such a requirement is sufficient where, as here, the statute was passed in large measure for the benefit of the individuals, firms, or industry upon which the agency seeks to impose a fee. Here, a principal function of the tariff-filing requirement is "insuring the economic stability of the trucking industry." *Locust Cartage Co. v. Transamerican Freight*

8. The tariff-filing requirement may contribute to industry stability in at least two ways. First, it may make secret price-cutting impossible, since tariffs are of course public records and inasmuch as a motor carrier must charge the rate specified in its tariff. Second, the requirement may make instantaneous price cuts more difficult; before lowering its rates to meet or undercut the competition, a carrier must go to *the trouble of filing its new proposed rates with the ICC.* These statutorily provided constraints on competition, in turn, stabilize the profits of individual carriers.

Our conclusion that this increased industry stability warrants the imposition of a filing fee may appear, at first blush, inconsistent with the statement in *NCTA II, see supra* p. 729, that a fee may not be predicated merely upon the adoption of some practice of general benefit to the industry as a whole. Such is not the case, however. The tariff system is, in a sense, a cooperative venture, sanctioned by statute and supported by the ICC, in which each carrier agrees to publish its rates, thereby foregoing the opportunity of making secret, precipitous rate cuts that would be advantageous to the carrier in the short run. In return, all the other carriers agree to similar behavior, the result of which is to stabilize prices in the industry. As

*Lines, Inc.,* 430 F.2d 334, 343 (1st Cir.1970); *see also, e.g.,* 18 CONG.REC. 171 (1886) (one purpose of tariff-filing requirement [made applicable to railroads by the Interstate Commerce Act of 1887 and later imposed on motor carriers by the Motor Carrier Act of 1935] was to bring about rate stability) (statement of Sen. Cullom). Each individual carrier benefits, at least in theory, from this stability.[8] The public, in contrast, derives no discernible benefit from the implementation of a necessary element of a regulatory system designed for the very protection and preservation of the various firms in the industry. We therefore find that this Commission activity produces sufficient private benefits to warrant imposition of a tariff filing fee.[9]

General rate increases produce similar private benefits. The Commission enumerated these benefits as follows:

> Under 49 U.S.C. 10761, carriers must charge the rate contained in their effective tariff.... The benefits to the carriers in using [general rate increases] are that they may change a greater number of rates at once [and] do so collectively....

already noted, this stability is one of the chief purposes underlying the tariff-filing requirement. The ICC, by accepting a carrier's tariffs, assists that carrier in fulfilling its obligation to the other carriers, even as it assists the carrier in complying with its statutory duty. Hence, in these special circumstances, the ICC's tariff-filing services benefit the individual carrier, and not merely the industry as a whole.

9. Petitioners make one additional argument against the ICC's conclusion that processing of tariffs confers a private benefit on motor carriers. They argue that the Commission's conclusion in *Ex Parte No. MC–165, Exemption of Motor Contract Carriers From Tariff Filing Requirements,* 133 M.C.C. 150 (1983), that tariff filing is burdensome and expensive for contract carriers, is inconsistent with the view expressed in the ICC's final decision that tariff filing produces a private benefit. These conclusions are not inconsistent, however. Tariff filing no doubt is burdensome and expensive but, as noted above, it also produces significant benefits for the industry. In our view, it is these industry-related (and non-public) benefits that justify imposition of a tariff filing fee in this case, notwithstanding any burdens to the carriers of complying with the requirement.

1 I.C.C.2d at 109. The petitioners challenge both of these assumed private benefits. They contend that general rate increases do not satisfy the carriers' tariff filing obligations and, moreover, that the authority to take collective action derives not from the general rate increase procedures but from 49 U.S.C. § 10706, which permits the Commission to grant antitrust immunity to rate associations. The gravamen of petitioners' contention seems to be that the procedures, implemented in 1971, which motor carriers must follow in filing general rate increases, *see New Procedures in Motor Carrier Revenue Proceedings*, 339 I.C.C. 324 (1971), *modified at* 340 I.C.C. 1 (1971) (*codified at* 49 C.F.R. Part 1139, Subpart A), are more burdensome and expensive than the Commission's previous procedures.

We are unpersuaded. Based on our reading of the applicable regulations, *see, e.g.*, 49 C.F.R. § 1139.1 (1984), a general rate increase is simply a mechanism for filing simultaneously a large number of tariffs. Although petitioners are technically correct that "the procedures do not provide the basis for compliance with the tariff-filing requirement," the general rate increase procedures do permit rate associations to file multiple new tariffs on behalf of their members much less expensively than if each of the carriers filed its new tariffs one by one. This is the clearest sort of private benefit.

Petitioners' argument as to the authority for collective action is also misplaced. Unlike the authority to *set* rates collectively, which is found in 49 U.S.C. § 10706, the authority collectively to docket and publish general rate increases is found at 49 U.S.C. § 10708(b)(6), which is implemented by the Commission's general rate increase regulations. All in all, the Commission's finding

that general rate increases produce private benefits was not arbitrary or capricious.

But this portion of our inquiry is not yet ended. We next must determine whether the Commission's processing of tariffs and general rate increases also produces independent public benefits that require allocation of a portion of the Commission's costs to the public. Petitioners argue that tariff-filing procedures produce two public benefits justifying such an allocation: *first*, remedying rate discrimination and, *second*, informing shippers in advance of the rate they will be obliged to pay for services rendered. *See* Brief for Petitioners at 47.[10]

Applying the "independence" inquiry which we previously described, however, we are persuaded that these purported public benefits are not in fact independent of the private benefits produced by tariff-filing. The agency's provision of the private benefit, that is, helping motor carriers to comply with a statute *designed for their benefit*, necessarily produces both of the asserted public benefits. Tariff-filing itself eliminates rate discrimination by virtue of the statutory requirement that a motor carrier not charge a rate different from the rate specified in its tariff and by the fact that a motor carrier can specify only one rate for each service it offers. *See* 49 U.S.C. § 10761(a). Similarly, because tariffs filed with the ICC are public records, tariff-filing necessarily permits shippers to find out the applicable rate for a given service. We must therefore conclude that tariff-filing produces no independent public benefits.

We reach a similar conclusion with respect to general rate increases. The Associations identify two public benefits which, they say, flow from general rate increases: "the assurance that the proposed general

---

**10.** Petitioners also contend that tariff-filing produces a third public benefit, namely increased rate competition. However, they have produced no evidence that tariff-filing actually produces this effect. The cases they cite in support of their argument, moreover, suggest the opposite. *See Locust Cartage Co., supra*, 430 F.2d at 343 (tariff-filing prevents "the kind of fluid, ad hoc ratemaking which endangers efficient ser-

vice;"); *Bowser and Campbell v. Knox Glass, Inc.*, 390 F.2d 193, 195–96 (3rd Cir.1968) (purpose of requirement that contract carriers file tariffs is to "prevent destructive competition between contract carriers and common carriers ... thus confer[ring] on common carriers a right of knowledge and surveillance of the actual competition from contract carriers").

rate increase or restructuring will be reasonable" and "the streamlining of administrative procedures." Brief for Petitioners at 43. Both of these benefits necessarily flow from the ICC's provision of a private benefit—permitting carriers to avoid the expense of multiple, individual tariffs. The statute permitting general rate increases or restructurings, 49 U.S.C. § 10708, in effect requires that such restructurings or increases be reasonable by limiting the allowed changes to certain small percentages of existing rates. *See id.* The Commission's procedures are designed in the main to ensure that the carriers comply with those percentages. *See, e.g.,* 49 C.F.R. §§ 1139.2, 1139.3 (1985). The second alleged public benefit, streamlining of administrative procedures, is also a necessary incident of the private benefit discussed above. The very procedures that allow a carrier to avoid filing multiple tariffs every time it overhauls its rate structure necessarily permit the Commission to avoid the expense of examining and processing all of these tariffs. The benefit to the ICC of more streamlined administrative procedures is therefore inseparable from the benefits carriers enjoy by virtue of those procedures.

**B**

We turn next to petitioners' challenge to the Commission's cost calculations. As we have already noted, a fee—even if otherwise justified in law—may not exceed the agency's cost. *See, e.g., Electronic Industries, supra,* 554 F.2d at 1114. Accordingly, the proper calculation of relevant costs is a crucial component of any fee rulemaking proceeding pursuant to the IOAA. That is not to say, however, that costs must always be calculated with scientific precision. As this court has observed, such calculations "must necessarily be based on numerous approximations and can only be expected to be accurate within reasonable limits." *NCTA II, supra,* 554 F.2d at 1105. Here, petitioners mount a broad challenge to the ICC's cost calculations, questioning both the Commission's overhead cost calculations and its calculations of the direct costs of specific services.

1. *Overhead Expenses*

Petitioners generally criticize the ICC for failing, without sufficient explanation, to follow past practice in estimating overhead costs. In particular, they demur to (1) the Commission's stated reliance on OMB Circular A–76 for certain cost items; (2) the Commission's treatment of its G & A expenses; and (3) its estimate of operations overhead. With the single exception noted below, however, we conclude that the ICC's departures from past practice were adequately explained.

■ First, ICC's reliance on OMB Circular A–76 for the governmental fringe benefit cost percentage (46.3 percent) was not an abuse of discretion. Quite to the contrary, it was entirely sensible and reasonable for the Commission to rely upon the extensive research and analysis already undertaken by OMB rather than instituting a costly, time-consuming, and quite likely duplicative study of its own fringe benefit costs.

In the face of this common-sensical approach, petitioners argue that reliance on the Circular for this purpose was improper because the Circular states that it is not to apply to "governmental functions." Upon analysis, however, it is clear that petitioners have gravely misinterpreted this limiting language. As petitioners themselves note, Brief for Petitioners at 19, the subject of the entire Circular is "Federal policy regarding the performance of commercial activities;" the Supplement to the Circular sets forth "procedures for determining whether commercial activities should be performed under contract with commercial sources or in-house." OMB Circular A–76 at 1. The provision relied upon by petitioners merely indicates that "governmental functions" (like processing the filings at issue here) should not be contracted out— even if a private contractor could perform the work more cheaply. The provision does not even imply, let alone say, that the methods set out in the Circular cannot appropriately be used to calculate the overhead costs of governmental functions. *See*

*id.* at 3. Nor have petitioners come forward with any evidence to buttress their suggestion that the percentages used in the Circular "have been pushed as high as possible" in order to encourage "the placement of work in the private sector." Brief for Petitioners at 22.[11]

■ Petitioners' objections to the G & A cost estimate are similarly lacking in merit. Petitioners question the G & A figure on two specific grounds, *first*, that the ICC failed to determine whether the percentage of G & A expenses in total agency costs is a valid measure of the percentage of G & A expenses in those offices performing fee-related services; and *second*, that the ICC did not reduce G & A expenses by 40 percent as it did the operations overhead expense. Brief for Petitioners at 26.

The first objection is clearly misplaced. In a multi-function agency or entity, G & A expenses are, as a general matter, expenses that cannot be allocated to a particular service; hence it would appear well nigh impossible for the ICC to make the precise, detailed determinations petitioners suggest. The second objection is groundless because the two kinds of expenses were estimated by quite different methods. Operational overhead was estimated from the 13-week time-and-motion study of direct labor costs *of fee-related services*, while G & A expenses were estimated using Commission-wide data. The original operational overhead figure of 18.04 percent was adjusted downward by 40 percent to reflect the percentage of mid-level supervisory time spent on non-fee-related matters. The original G & A figure of 9.7 percent was also adjusted downward to 9.1 percent to reflect the fact that some items

included in the original figure (such as travel costs) could clearly be said *not* to arise from fee-related services.[12] Hence, ample reason warranted adjusting the G & A expenses by a different percentage than that used to adjust operations overhead.

■ In contrast, petitioners' attack on the operations-overhead component appears to have merit. Petitioners apparently object to the operations-overhead calculation on the ground that the ICC incorrectly used the direct labor costs of lower-level supervisory personnel, as actually measured during the 13-week study period (and presumably included in the direct labor cost calculations), to *estimate* the cost of supervision by mid-level supervisors such as bureau directors and office heads. *See* Brief for Petitioners at 24. The Commission simply took the measured labor cost of lower-level supervision (expressed as a percentage of the Commission's total direct labor costs), then discounted that amount by 40 percent to account for time spent by mid-level supervisors on "other," *i.e.*, non-fee-related, business. *See* 49 Fed.Reg. at 6135. But that method of estimating the costs of mid-level supervision depends on the assumption that the *total* costs of mid-level supervisors (40 percent of which presumably is attributable to Commission activities other than processing the filings in question) is equal to the observed direct labor costs of lower-level supervisors. Without further justification than is set forth on this record, this assumption seems to us arbitrary.

Accordingly, the appropriate course in this respect is to remand to the Commission for further clarification of the basis of its operations-overhead figure. If, upon fur-

---

**11.** Petitioners' attack on the "enormous" number of hours of annual, sick, and holiday leave (a total of 42.9 days per year) used in the Circular also misses the mark. *See* Petitioners' Brief at 21. The number of hours used is apparently the number of hours to which an ICC employee with 3 to 15 years of service is entitled. *See* Government's Brief at 40–41. The only plausible argument against the OMB's methodology here—an argument not raised by petitioners—is that it fails to account for the fact that many employees may not use all of their sick or annual leave. It is not clear, however, whether

this would make much difference in the percentages.

**12.** Petitioners' other attack on the G & A component—based on an allegedly unexplained increase in rent, communications, and utilities of $36 million—apparently was withdrawn after the Government pointed out that the actual figure was $36,000 and satisfactorily explained the discrepancy which petitioners had pointed out. *See* Brief for Respondents at 42 n. 42; Petitioners' Reply Brief at 16 n. 14.

ther examination, the Commission determines that the assumptions underlying the estimated operational overhead costs are unwarranted, then the agency should re-estimate those costs and, if necessary, make any appropriate adjustments to the four fees at issue here. We, of course, leave it to the Commission in the first instance to decide which, if any, additional fees should likewise be adjusted.

### 2. Costs of Particular Services

■ In addition to their criticisms of the Commission's overhead cost estimates, petitioners also attack, more limitedly, the Commission's method of calculating the direct costs of three of the services at issue here—approval of association agreements, approval of significant amendments, and processing of tariffs.

a. *Association Agreements*—Petitioners quibble with the ICC's calculation of the direct costs of approving nonrail association agreements on three grounds. The first contention—that the Commission rejected without explanation the single case study on which the staff's cost estimate for a rate association application had been based, *see* Brief for Petitioners at 27—fails accurately to state the facts. There is no indication in the NOPR or anywhere else that the Commission rejected the case study. Rather, the ICC's explanation in the NOPR merely notes that *during the 13-week study period* there was no rate bureau application then being processed upon which the Commission could rely. It appears that the staff members who estimated labor costs used the case study as a guide to the procedures used in such a proceeding. *See* 49 Fed.Reg. at 6130.

The other two objections are equally meritless. Petitioners criticize as arbitrary the Commission's reliance on the judgment of a senior staff member that such an application would require twenty hours of supervisory time rather than ten. This is quibbling over trifles at its worst. The agency's decision seems entirely reasonable and in any event added no more than about $200 (out of a total of $7,600) to the estimated costs. We do not sit as a board of auditors, steeped in accountancy and equipped to second-guess an estimate which seems on its face to be reasonable.

Petitioners also failed to provide evidence supporting their third asserted grievance, namely, that rate association applications are routinely protested and that the ICC failed to exclude the costs of dealing with protests from its total cost estimate. In the absence of such evidence, we will not overturn the ICC's considered conclusion in this respect. Accordingly, we conclude that in this instance the Commission's calculation of its costs was not arbitrary or capricious.

b. *Significant Amendments*—We reach the same conclusion with respect to the Commission's fee for significant amendments. Petitioners' criticism of the four-year-old case study (relied upon in determining the cost of processing a rate association amendment) fails for the same reason as their criticism of the rate association agreement case study. *See* Brief for Petitioners at 37–38. There is no inconsistency between the NOPR and the final decision as to the Commission's use of this case study. Rather, it would appear that the Commission based its cost estimate on *both* the case study and on staff interviews, in the sense that the staff members who were interviewed relied upon the case study in estimating the time needed to process a rate association amendment. *See* 49 Fed. Reg. at 6130. Here too, petitioners failed to provide evidence that the costs calculated by the Commission include protest costs.

c. *Tariffs*—Petitioners raise two objections to the Commission's treatment of tariff processing costs. The first—that the Commission failed to explain its downward adjustment of the estimated costs—is without merit. The Commission clearly explained that decrease in its final decision. The cost estimate contained in the NOPR had been too large, according to the Commission, "due to [the ICC's] failure to consider multiple tariff series filings in a single transmittal letter." *See* 1 I.C.C.2d at 120.

Petitioners' second attack on the tariff-fee calculation is that the Commission improperly began its analysis by dividing the

costs of the ICC's Tariff Examining Branch by the number of tariffs filed during the one-week period covered by the Commission's tariff study. *See* Petitioners' Reply Brief at 12. According to petitioners, such an approach is never appropriate because, "irrespective of which office's costs are used, the process of division is at odds with the requirement of selecting certain expenses which are directly or indirectly related in a significant degree to a particular service which is the alleged justification for assessing the fee." *Id.* (quoting *NCTA II,* 554 F.2d at 1105). We cannot agree with this reading of *NCTA II,* however. Unlike the approach taken by the FCC in that case, the Commission here has attempted to identify the specific office in which the relevant direct costs are incurred, the Tariff Examining Branch. In further contrast to the FCC's approach at issue in *NCTA II,* the ICC is not attempting to pass the entire costs of a regulatory apparatus on to the regulated industry. *See NCTA II, supra,* at 1105.

The Commission's method would be unexceptionable, then, provided the Commission had persuasively established the proportion of Tariff Branch activities that could be attributed to the routine processing of tariffs. The Tariff Branch was not included as a part of the 13-week study, however, and the Commission's description of the one-week study upon which the cost estimate apparently was based contains no indication whether the Commission attempted to separate routine tariff processing from other activities. *See* 49 Fed.Reg. at 6119, 6133. The Commission, moreover, has provided no evidence to justify its inclusion of only 70 percent of Tariff Branch costs in the cost basis it used to determine the tariff fee. The cost calculation for tariff processing, then, appears arbitrary, although not for the precise reasons urged by petitioners. It may be that the Commission was merely indulging in an act of grace by reducing arbitrarily the total costs of the Tariff Branch by 30 percent. To avoid the pitfall of arbitrariness, however, the Commission is obligated to set forth a more thorough and reasoned explanation of the Tariff Branch's costs.

## IV

In summary, we remand this case to the ICC for a more thorough justification of, or amendments to, its estimated operational overhead expenses and its estimated tariff processing costs. It goes without saying that the Commission should make any appropriate adjustments to the fees at issue if this additional analysis suggests that errors have infected the calculations of these two items. The Commission's decision is otherwise unimpeachable; thus, the petitions for review are in all other respects denied.

*Judgment accordingly.*