846 F.2d 765
 269 U.S.App.D.C. 377, 56 USLW 2687
 FLORIDA POWER & LIGHT COMPANY, et al., Petitioners,
v.
UNITED STATES of America and Nuclear Regulatory Commission,
Respondents.
WISCONSIN ELECTRIC POWER COMPANY, et al., Petitioners,
v.
UNITED STATES of America and Nuclear Regulatory Commission,
Respondents.
ARKANSAS POWER & LIGHT COMPANY, et al., Petitioners,
v.
UNITED STATES of America and Nuclear Regulatory Commission,
Respondents.
 Nos. 86-1512, 86-1567 and 86-1571.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 21, 1987.
Decided May 13, 1988.
 
 On Petition for Review of an Order of the Nuclear Regulatory commission.
 Harold F. Reis, with whom Thomas A. Schmutz, Washington, D.C., was on the brief for petitioners Florida Power & Light Co., et al. Michael F. Healy and Ernest C. Baynard, Washington, D.C., also entered an appearance, for Florida Power & Light Co.
 Jay E. Silberg, Washington, D.C., was on the brief, for petitioners Wisconsin Elec. Power Co., et al.
 Joseph B. Knotts, Jr. and Scott M. DuBoff, Washington, D.C., were on the brief, for petitioners Arkansas Power & Light Co., et al.
 Irwin B. Rothschild, III, Deputy Asst. Gen. Counsel, Nuclear Regulatory Com'n with whom William C. Parler, Gen. Counsel, William H. Briggs, Sol., E. Leo Slaggie, Deputy Sol., Nuclear Regulatory Com'n, Peter R. Steenland, Jr., Jacques B. Gelin and Kathleen P. Dewey, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Dirk D. Snel, Atty. Dept. of Justice, Washington, D.C., also entered an appearance, for respondents.
 Michael A. Bauser, Washington, D.C., was on the brief, for amicus curiae The Committee on Nuclear Technology, et al., urging remand.
 Before RUTH BADER GINSBURG, STARR and NIES*, Circuit Judges.
 Opinion for the court filed by Circuit Judge NIES.
 Dissenting opinion filed by Circuit Judge STARR.
 NIES, Circuit Judge:
 
 
 1
 In three consolidated cases, thirty-one nuclear power reactor licensees (petitioners) seek to invalidate a final rule entered on September 16, 1986, by the Nuclear Regulatory Commission ("NRC" or "Commission"), which imposes a uniform "Annual Fee" on those licensees for the fiscal year 1987. "Annual Fee for Power Reactor Operating Licenses and Conforming Amendment," 51 Fed.Reg. 33,224 (Sept. 18, 1986), corrected at 52 Fed.Reg. 34,082 (Sept. 25, 1986), codified at 10 C.F.R. pt. 171 (1987). The Annual Fee was imposed under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub. L. No. 99-272, 100 Stat. 82 (1986), which became effective on April 7, 1986.
 
 
 2
 Petitioners argue, first, that the NRC violated the standards contained in COBRA for imposition of a fee. Second, they maintain that if COBRA were interpreted to authorize NRC's annual flat fee, then the measure would constitute an unconstitutional delegation of Congress' power to tax. In addition, petitioners assert procedural errors in promulgation of the rule which, they allege, deprived them of a meaningful opportunity to comment on the NRC rule and preclude meaningful appellate review. After reviewing petitioners' numerous variations on the above arguments,[1] we conclude that no sufficiently persuasive ground has been advanced to warrant judicial invalidation of the subject rule and that the rule lawfully implements COBRA.
 
 
 3
 * Before enactment of COBRA, the Commission, like other agencies, has charged user fees for special benefits rendered to identifiable entities under the Independent Offices Appropriation Act of 1952 ("IOAA"), 31 U.S.C. Sec. 9701 (1982) (see 10 C.F.R. pt. 170 (1987)). As established by judicial interpretation, the amount of a fee charged under IOAA is limited to the cost to the agency of a specific benefit rendered to a particular entity. See, e.g., National Cable Television Ass'n, Inc. v. United States, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974); Federal Power Comm'n v. New England Power Co., 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974). Under IOAA, the Commission has imposed fees for services, for example, for review of a license application or for an inspection, but it has never charged for providing general regulatory services ("generic services"), such as research and rulemaking. The Commission's IOAA fee schedule was judicially approved in Mississippi Power & Light Co. v. NRC, 601 F.2d 223 (5th Cir.1979), cert. denied, 444 U.S. 1102, 100 S.Ct. 1066, 62 L.Ed.2d 787 (1980). IOAA is generally applicable to all government agencies.
 
 
 4
 In 1985, Congress enacted COBRA which contains provisions directing the NRC, inter alia, to recoup up to thirty-three percent of its budget through charges imposed on its licensees. More specifically, section 7601(a) of COBRA, to be codified at 42 U.S.C. Sec. 2213, required the Commission, within ninety days after enactment, to evaluate a system to assess and collect annual fees from the Commission's licensees which would "fund all or part of the activities conducted by the Commission," and to provide Congress with a report. Under section 7601(b)(1), the Commission was required, within forty-five days of its report, to impose annual charges on its licensees through rulemaking, subject to three limitations: (1) the aggregate annual fees plus other amounts collected (e.g., under IOAA) "may not exceed" thirty-three percent of the Commission's fiscal year costs, (2) the annual charges must be "reasonably related to the regulatory service provided by the Commission," and (3) the charges "shall fairly reflect the cost to the Commission of providing such service."[2]
 
 
 5
 Acting within COBRA's tight deadlines, the Commission timely issued its final "Annual Fee" rule. That rule sets a uniform, annual fee for each power reactor operating licensee ("operating licensee") by calculating the Commission's costs budgeted for certain generic services which it concluded were reasonably related to regulating all licensees in that category. The total of those costs are compared with thirty-three percent of the Commission's budget less fees collected from all licensees under the IOAA. The smaller amount is adopted as the total amount to be recouped. The individual annual charge to each operating licensee is uniform, the total amount to be recouped simply being divided by the number of such licensees. If fees collected under IOAA and COBRA exceed the thirty-three percent ceiling, the rule provides for a refund. A particular licensee can request an exemption under certain circumstances. No COBRA fee is imposed on licensees other than operating licensees, although all licensees continue to pay IOAA fees. The NRC's methodology resulted in a fee of $950,000 per reactor for 1987. 51 Fed.Reg. at 33,231.[3]
 
 
 6
 The thirty-one petitioners before us are licensees on whom the new fees have been imposed.
 
 II
 
 7
 Petitioners challenge the Commission's interpretation of the statute, asserting that the standards of section 7601(b)(1) of COBRA do not authorize a uniform annual fee on operating licensees based on the cost of generic services. That challenge has several facets which we address in turn.
 
 
 8
 * Petitioners first argue that, while section 7601(b)(1)(B) states only that the user fees charged "shall be reasonably related to the regulatory service provided by the Commission" without specifying the recipient of the "regulatory service" that Congress had in mind, the paragraph cannot reasonably be interpreted to authorize fees except for regulatory services to an identifiable recipient. Per petitioners, the language of COBRA must be interpreted the same as the courts have interpreted the IOAA and other fee statutes: any fee (in contrast to a tax) must relate to a specific benefit bestowed upon a specific beneficiary. See, e.g., National Cable, 415 U.S. at 340-41, 94 S.Ct. at 1148-49 (fee, unlike tax, is for benefit to applicant "not shared by other members of society"); New England Power, 415 U.S. at 351, 94 S.Ct. at 1155 (charges for regulatory activities of benefit to an entire industry are in the "domain of taxes"). Also, per petitioners, a corollary of this requirement is that fees may not be assessed for activities that do not specifically benefit the feepayer or that serve an independent public interest. See, e.g., Central & S. Motor Freight Tariff Ass'n v. United States, 777 F.2d 722, 729-31 (D.C.Cir.1985); National Ass'n of Broadcasters v. FCC, 554 F.2d 1118, 1128-29 (D.C.Cir.1976) (invalidating FCC fee schedule because independent public interests were represented in all fees).
 
 
 9
 In this case, petitioners contend, the equal division of the costs of generic services results not only in one licensee carrying the burden of others who require more general services, but also in the licensees paying for the cost of services which have an independent public benefit. In the absence of an explicit legislative expression of intent to change generally understood limitations on fee collection, petitioners urge that the statute should be interpreted to preclude the NRC from entering into a "constitutionally unchartered area." Further, petitioners point out that the language of COBRA is sufficiently similar to the provisions of IOAA, except for the explicit direction in IOAA that the fee be based, inter alia, on "the value of the service to the recipient," that the COBRA fee authorization should be given the same interpretation.
 
 
 10
 Having considered petitioners' reasons for urging the application of the IOAA standard, including the constitutional implications in rejection of that standard, we are unpersuaded that Congress intended that COBRA incorporate the same limitations as IOAA. As petitioners acknowledge, noticeably absent from COBRA is the IOAA limitation that the fee reflect "the value of the [agency's] service to the recipient." Further, as the Floor Managers of COBRA made clear, the language was not intended to reiterate IOAA standards:
 
 
 11
 The charges assessed pursuant to this authority shall be reasonably related to the regulatory service provided by the Commission and fairly reflect the cost to the Commission of providing such service. This is intended by the conferees to establish a standard separate and distinct from the Commission's existing authority under the Independent Offices Appropriations Act of 1952 in order to permit the Commission to more fully recover the costs associated with regulating various categories of Commission licensees.
 
 
 12
 132 Cong.Rec. H879 (daily ed. March 6, 1986); 132 Cong.Rec. S2725-6 (daily ed. March 14, 1986) [hereafter cited as "Floor Managers' Report"].[4] Moreover, if the COBRA and IOAA fee standards were the same, COBRA would have been unnecessary. The conclusion appears inescapable that Congress did not intend the Commission to apply the IOAA standard, or the case law developed under that standard, when assessing fees under COBRA. Instead, Congress intended the Commission to recover costs of providing services which were not recoverable under IOAA. Indeed, Congress estimated that NRC should recover approximately $80,000,000 per fiscal year over and above IOAA collections. 132 Cong.Rec. H879 (daily ed. Mar. 6, 1986); 132 Cong.Rec. S2725 (daily ed. Mar. 14, 1986).
 
 
 13
 Under this interpretation, NRC may recover generic costs, that is, costs which do not have a specific, identifiable beneficiary. Moreover, we see no requirement that these generic costs must be reduced by a portion artificially allocated to public benefit, so long as the fees charged are "reasonably related" to services provided the feepayers and do not exact payment for an independent public benefit. See Central & S. Motor Freight, 777 F.2d at 729. Unlike IOAA, which if read literally gave virtually unlimited discretion to all government agencies to recoup the entire amount of an agency's budget "in the public interest," Congress has provided, by the provisions before us, specific direction to a single agency to recover a limited amount of the costs of generic services. With such direction, we conclude that Congress did not intend to require apportionment of generic services between benefit to the public and benefit to the licensees where, as appears here, the two are interdependent or inextricably intertwined.
 
 B
 
 14
 Other arguments against the NRC's interpretation of COBRA are narrower in scope. We are urged to hold, for example, that research, a major item in the cost base used to calculate the annual fee, is not a "regulatory service" within the meaning of section 7601(b)(1)(B). The Commission defends the inclusion of that item on the ground that the included research programs are necessary for the Commission to have continuing confidence that licensed reactors can be operated consistent with the public health and safety and the Commission's regulations. It points to the following statements in NRC's 1986 Annual Report, which describe the NRC's research effort as follows:
 
 
 15
 The programs of the Office of Nuclear Regulatory Research (RES) are an essential and integral part of the regulatory process. Safety research supports nuclear regulation by providing defensible technical bases for regulatory action to ensure the protection of public health and safety. NRC research efforts emphasize early identification of potential problems with operating reactors....
 
 
 16
 4 NRC Ann.Rep. 159 (1987).
 
 
 17
 Because the fee schedule at issue here is an agency rule based upon the agency's construction of the statute which it administers, the scope of our review is limited. Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). We must uphold the Commission's interpretation that the research included in the base is a "regulatory service," unless it is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." Central & S. Motor Freight, 777 F.2d at 729. In our judgment the Commission's interpretation passes that test.
 
 
 18
 Another argument is that the provision in section 7601(b)(1), directing the NRC to "collect annual charges from its licensees," clearly means from all of its licensees. The Commission imposed the fee only on one category of licensees, power reactor operators. It excluded materials licensees, for example, from the coverage of the rule. That exclusion violated COBRA under the petitioners' interpretation.
 
 
 19
 The statute itself is silent on which licensees are to be charged the annual fee. Congress intended, however, to allow the Commission to recover "costs associated with regulating various categories of Commission licensees." Floor Managers, Report, supra at 5 (emphasis added). Thus, we see nothing in the statute or legislative history which would deprive the Commission of wide discretion in this matter. The explanation for exclusion of groups other than operating licensees was that the Commission devotes a relatively small amount of resources to their regulation and that the large number of materials licensees, for example, would create administrative difficulties were the Commission to calculate an annual fee for them. 51 Fed.Reg. at 24082. We conclude that the Commission's explanation is not arbitrary and, thus, the Commission did not abuse its discretion by failing to impose the annual fee on all licensees.
 
 
 20
 Petitioners perceive another misconstruction of the statute in the imposition of a uniform fee on reactor operators, arguing that the words "reasonably related to the services provided" mean "provided to each licensee." We understand this argument to differ from the principal argument that the IOAA standard applies in that, even if the cost of generic services is included in the base, petitioners maintain, the statute requires apportionment of that cost among the individual licensees. This has been generally presented as a "fairness" argument, i.e., that smaller or less profitable licensees should not be made to shoulder the same burden as larger or more lucrative businesses.[5] We note with strong approval that the Commission is attempting to develop a revised fee schedule which would provide a range of fees.[6] While the NRC might have reasonably adopted a different fee schedule, the record does not indicate that Congress perceived such basic differences between licensees within a category that the statute precludes a uniform fee. We recall in this context the short time Congress afforded the Commission to frame and promulgate a rule.
 
 
 21
 Turning to paragraph (A) of section 7601(b)(1), petitioners assert error in the Commission's interpretation of "other amounts collected by the Commission." Such "other amounts" reduce the total amount of fees that may be collected under COBRA. The Commission did not include interest and late fees collected under 31 U.S.C. Sec. 3717 (1982), payments received from other governmental agencies, or fines and penalties collected from the licensees as "other amounts collected." The Commission limited the deduction for "other amounts collected" to the fees it collected under the IOAA.
 
 
 22
 We find the petitioners' arguments that the additional items are "other amounts collected" unpersuasive. Because the purpose of COBRA was to recover costs incurred by the Commission, the phrase "other amounts collected" can reasonably be interpreted to mean other cost-recovery measures, e.g., the IOAA. Penalties, fines, and interest charges are not cost-recovery measures. Moreover, petitioners' interpretation would allow utilities that violate the law, and pay consequent penalties or fines, to benefit by recovering a portion of the penalty or fine as a reduced user fee. We do not believe Congress intended such a result.
 
 
 23
 With respect to payments received from other governmental agencies, we reiterate that COBRA's purpose was to generate additional federal revenue. If NRC fees were reduced by the amount of reimbursements from other governmental agencies, per petitioners' interpretation of COBRA, the Commission would not achieve that statutory purpose. It is self-evident that a transfer of funds from one agency to another fails to increase federal revenue.
 
 III
 
 24
 Petitioners challenge the validity of the final rule because of alleged violations of the Administrative Procedure Act (APA) Sec. 4, 5 U.S.C. Sec. 553 (1982). The APA requires the Commission to provide notice of its proposed rulemaking adequate to afford "interested parties a reasonable opportunity to participate in the rulemaking process." Such notice must not only give adequate time for comments, but also must provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully. See, e.g., Connecticut Light & Power Co. v. NRC, 673 F.2d 525, 530-31 (D.C.Cir.), cert. denied, 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982); Home Box Office, Inc. v. FCC, 567 F.2d 9, 35 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).
 
 
 25
 On the latter point, petitioners assert that the NRC cost base statement is merely conclusory and that no explanation is given with respect to the criteria used to include or exclude particular items. They point, for example, to the dollar amount of the cost of reactor-related research in the proposed rule and to the reduction, purportedly without explanation, made in that cost figure in the notice promulgating the final rule.
 
 
 26
 In the final notice the Commission had explained that between the proposed and final rule it had reviewed the research costs "to ensure that only generic costs associated with all power reactors, with operating licenses, regardless of type, were included in the cost basis." 51 Fed.Reg. at 33226 (emphasis added). We note also that the lower cost base of the final notice still exceeded thirty-three percent of the NRC budget less IOAA fees, and, thus, the latter figure was used to limit the collectable fees. See 51 Fed.Reg. at 33228. It is essentially irrelevant, therefore, that some costs were removed from the base as long as the remaining costs meet, first, the statutory criteria that they be reasonably related to the regulatory services provided by the NRC and, second, the notice's criteria that the costs be associated with all operating licensees. Petitioners do not identify any included programs which do not fall into that category. We conclude that the Commission's explanation was adequate.
 
 
 27
 Petitioners also argue that the fifteen-day period for comment was too short. On that issue, the Commission notes that Congress gave it only ninety days to report and forty-five more days to enact a final rule. Given Congress' deadline, the Commission maintains that the fifteen days for comment were reasonable.
 
 
 28
 We find no evidence that petitioners were harmed by the short comment period. The Commission received sixty-one comments, some of them lengthy, addressing its proposed rule. Those comments had a measurable effect on the final rule. Petitioners have had a substantial period of time since publication of the final rule to consider the rule and the supporting data.[7] No substantive challenges which differ in kind from the original comments have been raised. In this instance, the short length of the comment period appears to be no more than a technical argument, which we do not find meritorious. In sum, we conclude that the Commission's rulemaking process did not violate the APA.
 
 IV
 
 29
 Having upheld the "Annual Fee" rule on all other asserted grounds, we must necessarily reach the issue of the statute's constitutionality, as interpreted to authorize assessment of fees for generic services. Petitioners argue that, under this construction, the statute constitutes an unconstitutional delegation to the Commission of Congress' power to tax under article I, section 8. If the Commission can require licensees to pay fees for generic, industry-wide services, petitioners argue, then the Commission has in effect been delegated a broad power to levy taxes. In petitioners' view, such a delegation would be unconstitutional on two grounds: (1) the Constitution does not permit Congress to delegate its taxing power, so that any delegation would be unconstitutional, and (2) the delegation here is unconstitutional, in any event, because it constitutes a transfer of power that is unchecked by intelligible standards. We disagree; even if the NRC assessment were characterized a "tax" rather than a "fee," this delegation would meet constitutional limitations.
 
 
 30
 * The decisions of the Supreme Court in National Cable and New England Power lay the foundation for the analysis of the issue raised by petitioners' first ground and must be briefly reviewed. Both involved the IOAA. The IOAA authorized each federal agency to prescribe by regulation a fee for the agency's services,
 
 
 31
 taking into consideration the direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts....
 
 
 32
 National Cable, 415 U.S. at 337, 94 S.Ct. at 1147 (quoting the IOAA of 1952, 31 U.S.C. Sec. 483a, as it read before Title 31 was revised in 1982).
 
 
 33
 The statement of facts in National Cable indicates that the FCC imposed fees upon community antenna television (CATV) systems, pursuant to the IOAA, for the first time in 1970. CATV outlets, while not licensees of the FCC, had been held subject to some regulation by that agency. See United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). The FCC estimated its direct and indirect costs for CATV regulations and imposed a uniform annual fee to recover that entire amount of its costs from CATV systems, determining that such recovery was "fair and reasonable" and approximated the "value to the recipient" within the meaning of the IOAA.
 
 
 34
 Focusing on the word "fee" used in IOAA, the majority in National Cable discussed the different connotation of that term, as used in the IOAA, from a "tax." The opinion contains the following passage, which has led to much debate:
 
 
 35
 Taxation is a legislative function, and Congress, which is the sole organ for levying taxes, may act arbitrarily and disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income. A fee, however, is incident to a voluntary act, e.g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society. It would be such a sharp break with our traditions to conclude that Congress had bestowed on a federal agency the taxing power that we read 31 U.S.C. Sec. 483a narrowly as authorizing not a "tax" but a "fee." A "fee" connotes a "benefit" and the Act by its use of the standard "value to the recipient" carries that connotation. The addition of "public policy or interest served, and other pertinent facts," if read literally, carries an agency far from its customary orbit and puts it in search of revenue in the manner of an Appropriations Committee of the House.
 
 
 36
 National Cable, 415 U.S. at 340-41, 94 S.Ct. at 1149 (footnote omitted). In the companion case of New England Power, the Supreme Court further distinguished the IOAA-intended "fee" system from a "tax" system, focusing on the "benefit" to an "identifiable recipient" who "asked for" and "received" services from the agency.
 
 
 37
 Petitioners argue that in these decisions the Supreme Court prohibited any delegation of the power to tax and held that an agency may impose fees (as delimited therein) only for services to individual beneficiaries and not for services that have a general public benefit. The Court so interpreted the IOAA, per petitioners, to avoid a constitutional problem and, indeed, drew a distinction between "fees" and "taxes" of constitutional dimension. The government maintains that National Cable and New England Power do not fix the constitutional boundary of Congress' power to give an agency authority to impose charges on entities within its regulatory power by a "metaphysical distinction" between "fees" and "taxes."
 
 
 38
 A close reading of those decisions supports the government's position. The "constitutional problem" actually discussed and avoided by the Court was the delegation of congressional power to agencies without Congress setting standards for their guidance. Specifically, the Court said:
 
 
 39
 The Court, speaking through Mr. Chief Justice Hughes said in Schechter Corp. v. United States, 295 U.S. 495, 529 [55 S.Ct. 837, 843, 79 L.Ed. 1570]:
 
 
 40
 "The Constitution provides that 'All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.' Art. I, Sec. 1. And the Congress is authorized 'To make all laws which shall be necessary and proper for carrying into execution' its general powers. Art. I, Sec. 8, par. 18. The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."
 
 
 41
 Congress, of course, does delegate powers to agencies, setting standards to guide their determination. Thus, in Hampton & Co. v. United States, 276 U.S. 394 [48 S.Ct. 348, 72 L.Ed. 624], Congress enacted a flexible tariff law which authorized the imposition of customs duties on articles imported which equaled the difference between the cost of producing them in a foreign country and of selling them here and the cost of producing and selling like or similar articles in the United States. Provision was made for the investigation and determination of these differences by the Tariff Commission which reported to the President who increased or decreased the duty accordingly. The Court in sustaining that system said: "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." Id., at 409 [48 S.Ct. at 352].
 
 
 42
 Whether the present Act meets the requirement of Schechter and Hampton is a question we do not reach. But the hurdles revealed in those decisions lead us to read the Act narrowly to avoid constitutional problems.
 
 
 43
 National Cable, 415 U.S. at 342, 94 S.Ct. at 1149-50.
 
 
 44
 The majority opinion in National Cable makes no mention of a flat constitutional prohibition against delegation of the tax power. Had there been no dissent, it is unlikely scholars would have launched into the esoteric debate over which powers of Congress can be delegated and which cannot.[8] It is the dissent that interjected the idea that the majority's discussion of constitutional problems turns on a "metaphysical distinction" between taxes and fees. New England Power, 415 U.S. at 352, 94 S.Ct. at 1155 (Marshall, J., concurring) (incorporated by reference as dissent to National Cable, 415 U.S. at 344, 94 S.Ct. at 1150). While a lower court is not free to depart from a holding of the Supreme Court and will pay close attention even to dicta therein, we know of no principle that requires us to accept the characterization of the majority's holding put forth in a dissent. In some instances the majority may choose to add comments to answer specifically a mischaracterization of its ruling. See, e.g., Bowen v. Yuckert, --- U.S. ----, 107 S.Ct. 2287, 2294 n. 6, 96 L.Ed.2d 119 (1987) ("According to the dissent our opinion implies that the Secretary has unlimited authority to deny meritorious claims.... It hardly needs saying that our opinion carries no such implication."). That choice is, however, simply a matter of judicial style, and a majority's failure to comment cannot be taken as acceptance of a strawman raised by dissent.
 
 
 45
 Thus, our obligation here is to interpret and apply the majority opinions in National Cable and New England Power. We read those opinions to hold that the "constitutional problem" mentioned therein was the adequacy of the standards in the delegation. Without the Court's narrow reading of the IOAA, the standards were constitutionally suspect. That interpretation was found, however, to be mandated by the language of the statute and the legislative history, both indicating that the IOAA authorized fees only for specific benefits to specific licensees. Nothing indicates that the interpretation was dictated by a constitutional prohibition against delegation by Congress of the tax power where adequate standards are set for implementation of congressional intent.
 
 
 46
 One need only briefly review the Schechter and Hampton decisions, relied upon for the holding in National Cable, to conclude that the Court did not hold in National Cable that the taxing power could not be delegated. The Court in Schechter discussed "limitations of the authority to delegate" and found that a delegation of legislative power, under section 3 of the National Industrial Recovery Act of June 16, 1933, was unconstitutional. Congress had failed to lay down the policies and to establish standards under which such delegation was to be exercised. The Court's citation to Schechter in National Cable indicates, therefore, that it was discussing delegations in general without differentiating the taxing power from other powers.
 
 
 47
 The Court's reliance on Hampton, 276 U.S. at 409, 48 S.Ct. at 352, completely negates the gloss petitioners put on the National Cable decision. Hampton specifically addressed delegation of the tax power. Rather than forbidding such delegation, Hampton explicitly sanctioned such delegation at the specific point of reference:
 
 
 48
 It is conceded by counsel that Congress may use executive officers in the application and enforcement of a policy declared in law by Congress, and authorize such officers in the application of the Congressional declaration to enforce it by regulation equivalent to law. But it is said that this never has been permitted to be done where Congress has exercised the power to levy taxes and fix customs duties. The authorities make no such distinction. The same principle that permits Congress to exercise its rate making power in interstate commerce, by declaring the rule which shall prevail in the legislative fixing of rates, and enables it to remit to a rate-making body created in accordance with its provisions the fixing of such rates, justifies a similar provision for the fixing of customs duties on imported merchandise. If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power.
 
 
 49
 Hampton, 276 U.S. at 409, 48 S.Ct. at 352 (emphasis added).
 
 
 50
 Nothing said in National Cable, or any other Supreme Court case, overrules Hampton explicitly or implicitly. Being bound by Hampton, we decline petitioners' invitation to join in a debate on the difference between a "fee" and a "tax." While the difference has merit in other contexts, the difference does not rise to the level of making a delegation of taxing power, per se, unconstitutional. Thus, we reject petitioners' broad-brush argument and, assuming arguendo that the assessment under review is a "tax," turn to the question whether Congress has laid "down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform." Hampton, 276 U.S. at 409, 48 S.Ct. at 352.
 
 B
 
 51
 The standard set out in COBRA establishes a legislative policy that NRC collect up to thirty-three percent of its budget from fees "reasonably related to the regulatory service provided by the Commission" and that the fees "fairly reflect the cost to the Commission of providing such service." The burden is, of course, on petitioners to show that these standards are unintelligible. See, e.g., Yakus v. United States, 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944); Amalgamated Meat Cutters & Butcher Workmen v. Connally, 337 F.Supp. 737, 746 (D.D.C.1971). We are unpersuaded that petitioners have done so. Petitioners' argument returns again to the IOAA standard, this time to put forth the "specific beneficiary/specific benefit" standard as the minimum guide for assessment of charges. The NRC authorization under COBRA is markedly different from IOAA. To impose the IOAA standard on COBRA would defeat COBRA's purpose.[9] We conclude that the delegation is no less precise, indeed, much more precise than delegations upheld by the Supreme Court. See, e.g., Lichter v. United States, 334 U.S. 742, 785-86, 68 S.Ct. 1294, 1316-17, 92 L.Ed. 1694 (1948) (recovery for "excessive profits" earned on war contracts); American Power & Light Co. v. SEC, 329 U.S. 90, 97, 67 S.Ct. 133, 138, 91 L.Ed. 103 (1946) (existence of company in holding company system must not "unduly or unnecessarily complicate the structure" or "unfairly or inequitably distribute voting power among security holders"); Yakus v. United States, 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944) (maximum prices must be "generally fair and equitable"); FPC v. Hope Natural Gas Co., 320 U.S. 591, 600, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944) ("just and reasonable rates" for natural gas); National Broadcasting Co. v. United States, 319 U.S. 190, 225-26, 63 S.Ct. 997, 1013-14, 87 L.Ed. 1344 (1943) (licensing of radio communications "as public convenience, interest or necessity requires"); Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 397, 60 S.Ct. 907, 914, 84 L.Ed. 1263 (1940) (price established for mine must yield a "fair return" on "fair value" of property); New York Cen. Sec. Corp. v. United States, 287 U.S. 12, 24, 53 S.Ct. 45, 48, 77 L.Ed. 138 (1932) (permitting consolidation of carriers when "in the public interest").
 
 
 52
 Moreover, it appears that in only two cases in all of our jurisprudence has the congressional delegation to an agency been invalidated on the ground that Congress has delegated power without sufficient standards, specifically, Schechter (no standards provided to define when President should exercise delegated power to prohibit transportation of certain oil in interstate commerce, described as a "delegation running riot" in Justice Cardozo's concurrence, 295 U.S. at 553, 55 S.Ct. at 853) and Panama Ref. Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) (Congress abdicated its legislative function by giving President virtually unlimited legislative authority over the economic system).
 
 
 53
 Without defining the limits of the COBRA delegation to the NRC, we conclude that the NRC has exercised its authority within congressional guidelines that provide sufficient standards. The NRC has reasonably limited regulatory services to programs which it concluded, with sufficient explanation, were clearly applicable to all operating licensees. Further, it reasonably limited the charges to those licensees only. We are unpersuaded of error or impermissible arbitrariness in the NRC's implementation of the statutory directive.
 
 V
 
 54
 We have addressed only the arguments raised by petitioners which we found evoked the most serious questions concerning the legality of the NRC's annual user fee rule. A failure to address the nuances of some of petitioners' arguments should not be taken to mean that they were not considered. In sum, we uphold the Commission's 1987 annual user fee rule.
 
 STARR, Circuit Judge, dissenting:
 
 55
 I respectfully dissent. Although both sides stake out rather rigidly extreme positions, the more reasonable, middle ground is that the NRC's decision, albeit reached under difficult time constraints, fails to pass muster under both the first and second steps of the familiar Chevron analysis.
 
 
 56
 * Petitioners rely on National Cable Television Association, Inc. v. U.S., 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974) ("NCTA "), its companion case Federal Power Commission v. New England Power Co., 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974), and the series of opinions from this court interpreting those two cases[1] for the proposition that, in order for the NRC fees to be sustained, the fees must be shown (1) to reflect the cost of providing specific benefits to identifiable power reactor licensees and (2) to exclude costs that serve independent public benefits.[2]
 
 
 57
 Petitioners make, in essence, two arguments for applying these criteria to the NRC fees at issue. First, they argue that NCTA and its progeny draw a distinction between "fees," which agencies may assess (subject to the limitations developed in the decisional law), and "taxes," which can be assessed only by Congress. Since the power to tax cannot be delegated to an administrative agency, the argument runs, Congress must have intended to authorize only a fee, which is therefore subject to the two criteria listed above.[3] Second, petitioners argue that the language of COBRA tracks the language of both the IOAA and cases construing the latter statute. From this, petitioners conclude that Congress intended the criteria developed in that body of law to apply to COBRA. In petitioners' view, the fee schedule must be invalidated and the assessments refunded, because the NRC did not apply these criteria in arriving at its fee assessments in the instant case.
 
 
 58
 NRC, not surprisingly, is of a decidedly different perspective. The Commission contends that the NCTA line of cases is irrelevant to COBRA's provisions. Under COBRA, the applicable statutory standard requires only that the NRC impose charges that "reasonably relate[ ] to the regulatory services" it provides and that those charges "fairly reflect the cost ... of providing" such services. Since it has calculated the annual charge in accordance with those standards, NRC maintains, its assessment under the auspices of COBRA should be sustained.
 
 
 59
 These, then, are the competing positions. Both, as I indicated at the outset, seem rather extreme. If, as petitioners argue, Congress intended the same criteria for fee assessments developed under the IOAA to apply here, then enactment of COBRA would have been but a hollow exercise. Clearly, Congress intended NRC to go beyond the impositions of fees already assessable under IOAA. See FPL Brief at 28; maj. op. at 769. Nor can petitioners successfully argue that the NCTA line of cases (or indeed, NCTA itself) stakes out the outer limits of Congress' power to delegate assessment authority. The specific criteria enunciated in those cases were developed in the context of construing a particular statute (the IOAA). The standards enumerated in Central & S. Motor Freight Tariff Ass'n v. ICC, 777 F.2d 722 (D.C.Cir.1985), for example, are certainly not, as I understand them, of constitutional dimension.[4]
 
 
 60
 I thus agree with my colleagues that "Congress [did not] intend[ ] that COBRA incorporate the same limitations as IOAA." Maj. op. at 768. I also agree that COBRA was intended to authorize the NRC to recover generic costs, such as those for research and rulemaking. Maj. op. at 769.[5]
 
 
 61
 On the other hand, NRC's sweeping interpretation of COBRA is also extreme, as the Commission itself recognizes. From NRC's calculation of the annual charge, it is apparent that the agency interprets the requirement that the fee be "reasonably related to the regulatory service provided" in a manner that reads out any requirement that the service provide specific benefits to identifiable beneficiaries. NRC makes no benefit-side calculation whatsoever, other than the hopelessly general determination that all services that form the basis for its cost calculations benefit the entire class of holders of power reactor operating licensees to a greater or lesser extent. NRC makes no attempt to allocate specific benefits to identifiable beneficiaries; nor does the Commission explain why a per capita assessment best makes any such allocation.
 
 
 62
 The only virtue of NRC's method of calculating the annual fees is its Spartan simplicity. In what Doestoevsky would doubtless characterize as an act of bureaucratic passion, the agency in classic Washington fashion aggregated all portions of the NRC's budget that benefited all power reactor licensees as a class; that amount was then divided among all reactor licensees. NRC made no attempt to show that its expenditures reflect the same costs or the same benefits for each nuclear power reactor. Not only did the $950,000 annual fee apply to every power reactor licensee, without regard to whether (or to what extent) the licensee seeks the services of the Commission during the course of the year, but it likewise did not vary with any burden that the individual licensee places on the Commission.
 
 
 63
 NRC's studied inattention to the "benefits" calculation represents a dramatic break with IOAA methodology, a cleavage unsupported by the limiting language that Congress fashioned in COBRA. And therein lies the rub; COBRA, in my reading of it, mandates that NRC consider this side of the calculation.
 
 
 64
 First, COBRA authorizes the NRC to collect fees only for a "regulatory service provided." Whatever its precise meaning, this phrase, fairly read, conveys the need for some sort of "benefits" calculation. It requires the agency to make some assessment of which (and how much) licensees are benefitted by its "regulatory services." In broadly defining the basis for NRC's assessments, Congress must have meant for the NRC to take an expansive approach, one that would capture generic regulatory services. See supra p. 777. To this extent, I am in happy accord with my colleagues. But at the same time, I cannot agree that Congress meant that anything goes. This language, rather, is meant to require the NRC to weigh the benefits of its regulatory services to set fees for licensees in a fashion that takes those benefits into account.
 
 
 65
 Second, in enacting COBRA, Congress was not writing on a blank slate. It was legislating against the backdrop of a well-established body of judicial decisions construing fee statutes in general and the IOAA in particular. In adopting terms such as "regulatory service provided" and "reasonably related," Congress can reasonably be assumed to have adopted at least some of the gloss placed on those terms through the decisional law.[6] Our decisions under the IOAA have frequently referred to fee recovery for services provided by regulatory agencies, and we have often employed the phrase "reasonably related" to articulate the relationship that must obtain between costs to the regulator and benefits to the regulated. See National Cable Television Ass'n v. FCC, 554 F.2d 1094, 1106-07 (D.C.Cir.1976); Electronic Indus. Ass'n v. FCC, 554 F.2d 1109, 1114-15 (D.C.Cir.1976); National Ass'n of Broadcasters v. FCC, 554 F.2d 1118, 1133 (D.C.Cir.1976); Capital Cities Communications, Inc. v. FCC, 554 F.2d 1135, 1138 (D.C.Cir.1976).[7]
 
 
 66
 Third, although admittedly of highly limited relevance because of its post-enactment status,[8] Senator Simpson, one of the Senate managers of COBRA, explained after the bill's passage that "[COBRA] requires the Commission to demonstrate on a licensee-specific basis that the fee to be assessed is reasonably related to the actual cost of the regulatory service provided...." 132 Cong.Rec. S16,964 (daily ed. Oct. 17, 1986) (emphasis added). Indeed, Senator Simpson was vociferously critical of the Commission's handling of the per capita fee assessment:
 
 
 67
 [B]y adopting a flat annual fee for all nuclear power reactors--other than those not authorized to operate--regardless of the variance in the regulatory service that would be provided to each individual licensee and the corresponding variance in the cost of providing such service--the Commission has virtually disregarded the directive contained in [COBRA ]. Indeed, the "back calculation" that the Commission has undertaken in order to reach this flat fee ... is about as far from what was contemplated under [COBRA] as I can possibly imagine. If the fee reached through this bizarre calculation has any relation to the actual regulatory costs for individual licensees, it is only by coincidence, Mr. President--and certainly it is not the kind of determination that I think that Congress had in mind when it enacted [COBRA].
 
 
 68
 132 Cong.Rec. S16963 (daily ed. Oct. 17, 1986) (emphasis added).
 
 
 69
 Finally, it cannot reasonably be thought that the Commission is somehow unable to attend to the benefit side of the equation. NRC's recent efforts to link more closely regulatory costs incurred to benefits received by individual licensees belie any "impossibility" defense. In response to an inquiry from the Committee on Environment and Public Works, the NRC Chairman wrote:The Commission believes that it can develop a revised [fee rule under COBRA] that provides for tying fees more closely to the costs of providing specific services rendered to specific licensees.... The Commission, after further reflection, now recognizes that it would be preferable to base its annual fee on the principle that those licensees who require the greatest expenditure of NRC resources should pay the greatest annual fee.
 
 
 70
 Letter of Apr. 10, 1987, WEP Brief, Appendix C, Question 12.[9]
 
 
 71
 In sum, traditional tools of statutory construction lead me to conclude that, in the absence of indications to the contrary, Congress could not reasonably have intended to work such a complete break from judicial decisions interpreting the pivotal terms that Congress deliberately employed. Although Congress intended to go beyond the IOAA, it just cannot be that the Article I branch meant to permit the Commission to take such grossly nontailored action.
 
 II
 
 72
 But there is another, and highly fundamental, reason for insisting that the agency move more cautiously than it did in interpreting COBRA. Whatever the boundaries of the constitutional limits on Congress' ability to delegate its taxing power, the fact that a constitutional issue looms menacingly in the background counsels in favor of a narrower construction of COBRA than that embraced by the Commission.[10] As the FPL petitioners aptly put it, "it is ... wholly inappropriate to assume that, without having made its intention express, Congress empowered the NRC to enter into what, at best, must be regarded as a constitutionally unchartered area." FPL Brief at 26.
 
 
 73
 Fortunately, there are some familiar markers to assist us in finding our way. The identical situation confronted the Court in NCTA when it first addressed the IOAA. In that case, the Supreme Court supplied a narrowing construction in order to avoid constitutional problems arising out of the lack of intelligible standards contained in the text of the Act itself.[11]
 
 
 74
 The difficult question in such cases is where to draw the lines. If Congress had enacted a statute directing the NRC to collect fees up to the constitutional limits of its authority, then we would be forced to define those limits. But that is not what Congress enacted; rather, as I have already tried to show, Congress saw fit to enact a statute expressly containing (by reference to decisional law under the IOAA) limiting language. In particular, Congress' use of a two-pronged articulation of the standard is interpretively significant. It suggests that Congress meant for the NRC, in making its assessment calculation, to weigh both benefit to the regulated entity and cost to the NRC. NRC's self-confessed inattention to the benefit side of the equation is fatal to its interpretation.[12]
 
 
 75
 Once again, I am not suggesting that COBRA incorporates precisely the standards of the IOAA.[13] Nor am I suggesting that scientific precision is required. To the contrary, a fair approximation of the benefit inuring to the licensee would have sufficed.[14]
 
 
 76
 NRC has done nothing in this respect. It has failed entirely to seek to allocate among the various individual recipients the costs of regulation that it seeks to recover through COBRA, or to explain why it cannot make such an allocation. The Commission failed to consider any of a number of methods by which it might have drawn a closer fit between benefit and burden. By way of modest suggestion, these include (1) basing the annual fee upon the level of a licensee's fee assessments under the IOAA as an approximation of that licensee's use of regulatory services; or (2) basing the fee upon the amount of time spent by the NRC on each licensee or the number of regulatory matters pending. See WEP Brief at 35, 43.[15]
 
 
 77
 In failing to consider such linkages, the NRC effectively reads out of the statute standards requiring its fees to be "reasonably related" to "regulatory services provided." It is singularly unlikely that each licensee--regardless of differences in demand for regulatory services, plant size, plant age and other factors--derives roughly the same benefits as every other licensee.[16] But that remarkable, egalitarianism-with-a-vengeance perspective is precisely the assumption undergirding the NRC's fee regime. The agency's statutory interpretation thus lacks the "reasoned explanation" required by Rettig v. Pension Benefit Guaranty Corp., 744 F.2d 133, 151 (D.C.Cir.1984) ("a reviewing court must determine both whether the interpretation is arguably consistent with the underlying statutory scheme in a substantive sense and whether "the agency considered the matter in a detailed and reasoned fashion" (citing Chevron, 467 U.S. at 865, 104 S.Ct. at 2793)). See also Continental Air Lines v. Department of Transportation, 843 F.2d 1444, 1451-53 (D.C.Cir.1988) (discussing the application of a "reasoned decisionmaking" requirement to agencies' statutory interpretations).
 
 
 78
 Thus constrained to conclude that the NRC's interpretation of the statute was unreasonable within the meaning of Chevron and its progeny, I would grant the petition for review.
 
 
 
 *
 Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 291(a)
 
 
 [1]
 Petitioners filed three, lengthy, separate, main briefs. Many of the arguments were essentially duplicative but were emphasized in one context in one brief and in another context in another. We have attempted to cover each point only once in a cohesive opinion. However, all arguments were taken into consideration in connection with the facet of the case in which it was presented by the various petitioners, as well as where it is expressly discussed in this opinion
 
 
 [2]
 Section 7601(b)(1) of COBRA provides in pertinent part:
 (A) The maximum amount of the aggregate charges assessed pursuant to [COBRA] in any fiscal year may not exceed an amount that, when added to other amounts collected by the Commission for such fiscal year under other provisions of law, is estimated to be equal to 33 percent of the costs incurred by the Commission with respect to such fiscal year; and
 (B) any such charge assessed pursuant to this paragraph shall be reasonably related to the regulatory service provided by the Commission and shall fairly reflect the cost to the Commission of providing such service.
 
 
 [3]
 Refunds were made as a result of higher than expected IOAA fees and other adjustments resulting in a fee of $838,000 for 1987. Some full waivers and partial exemptions of the annual fee have been granted for owners of a few, older reactors who might find it in their economic interest to close their reactors rather than pay the fee
 
 
 [4]
 The House Energy and Commerce Committee added NRC user fee provisions to proposed budget reconciliation legislation in late 1985. Without floor debate on those provisions, the House passed the legislation. 131 Cong.Rec. H10954 (daily ed. Dec. 5, 1985). The Senate-passed version of the legislation did not even contain NRC user fee provisions, nor was there reported discussion in the Senate of the provisions. After the House-proposed provisions were submitted to the Conference Committee, COBRA issued. Both houses of Congress noted the Conference Report's failure to discuss the NRC user fee provisions; they explained the conferees' silence as an "oversight." 132 Cong.Rec. 14879 (daily ed. Mar. 6, 1986); 132 Cong.Rec. 52725 (daily ed. Mar. 4, 1986). Consequently, a statement by the Floor Managers about the NRC fee provisions was inserted into the Congressional Record
 
 
 [5]
 Contrary to the dissent, the majority does not treat the statutory interpretation argument (see II A) as a "fairness" argument
 
 
 [6]
 Commission Chairman Lando W. Zech, Jr., in drafting the Commission's "responses to additional post-hearing questions for Senator Simpson on user fees" and other matters "for inclusion in the Budget hearing record of February 18, 1987," stated:
 The Commission, after further reflection, now recognizes that it would be preferable to base its annual fee on the principle that those licensees who require the greatest expenditure of NRC resources should pay the greatest annual fee. The NRC staff is now developing a proposed rule that would implement this approach.
 Letter from Lando W. Zech, Jr. to Sen. Quentin Burdick, Chairman of the Committee on Environment and Public Works (April 10, 1987).
 
 
 [7]
 We have considered petitioners' attack on the adequacy of the supporting data and the delay in availability. Given the broad nature of the programs which are included in the base, the data here are adequate. We are unpersuaded that the information was not available in time for meaningful comment. Again, the focus of this attack is, in essence, that a fee based on the costs of generic services is impermissible. Similarly, petitioners' attack on the NRC's methodology in computing the annual fee is largely tied to its argument that fees must be calculated on the basis of identifiable benefits to identifiable, individual recipients
 
 
 [8]
 Compare B. Schwartz, Administrative Law Sec. 2.10 at 50-51 (2d ed. 1984), with 1 K. Davis, Administrative Law Treatise Sec. 3:13 at 200 (2d ed. 1978)
 
 
 [9]
 The Supreme Court has made it clear that the standards of a delegation of power in a statute are not tested in isolation. Rather, they derive "meaningful content from the purpose of the Act, its factual background and the statutory context." American Power & Light Co. v. SEC, 329 U.S. 90, 104, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946). See also Lichter v. United States, 334 U.S. 742, 785, 68 S.Ct. 1294, 1316, 92 L.Ed. 694 (1948); Fahey v. Mallonee, 332 U.S. 245, 250-52, 67 S.Ct. 1552, 1554-55, 91 L.Ed. 2030 (1947)
 
 
 [1]
 In 1976, this court decided a series of four companion cases providing substantial gloss on the Supreme Court decisions noted in the text: National Cable Television Ass'n v. FCC, 554 F.2d 1094, Electronic Indus. Ass'n v. FCC, 554 F.2d 1109, National Ass'n of Broadcasters v. FCC, 554 F.2d 1118, Capital Cities Communications, Inc. v. FCC, 554 F.2d 1135
 
 
 [2]
 See, e.g. APL Brief at 19 ("In order to be sustained by this Court, the annual user fees that the NRC adopted pursuant to COBRA must be shown to reflect the cost to the government of providing specific benefits to identifiable power reactor licensees, and exclude costs that serve independent public benefits.")
 
 
 [3]
 Alternatively, petitioners argue that if Congress can delegate its taxing power, it must provide intelligible standards to guide agency discretion. Since Congress failed to provide such standards in this instance, the argument runs, Congress could not have intended a delegation of taxing authority--or if it did, the attempted delegation is invalid
 
 
 [4]
 Central & S. Motor Freight Tariff Ass'n is the most recent word in this circuit on the criteria to which an administrative agency must adhere in assessing fees under the IOAA. There, the court enumerated five criteria that fee assessments must meet under the IOAA:
 (1) the agency must identify the specific agency activity or activities for which the fee is being assessed;
 (2) the service must produce a special, private benefit;
 (3) the value of that private benefit must be reasonably related to the fee;
 (4) the benefit must accrue at least in part to an identifiable private beneficiary and not merely to the industry as a whole; and
 (5) the service in question must produce no independent public benefit.
 777 F.2d at 730.
 
 
 [5]
 COBRA was enacted against a backdrop of decisional law that definitively constrained fees levied under the authority of IOAA. Under that law, the NRC could not recover, for example, research and rulemaking costs. See, e.g., Mississippi Power & Light Co. v. United States Nuclear Regulatory Comm'n, 601 F.2d 223 (5th Cir.1979), cert. denied, 444 U.S. 1102, 100 S.Ct. 1066, 62 L.Ed.2d 787 (1980). COBRA, it seems to me, was designed to break out of those constraints on IOAA fee assessment
 
 
 [6]
 See, e.g., Blitz v. Donovan, 740 F.2d 1241, 1245 (D.C.Cir.1984) (Tamm, J.):
 In construing statutes, the Supreme Court has found it "always appropriate to assume that our elected representatives ... know the law...." Cannon v. University of Chicago, 441 U.S. 677, 696-97 [99 S.Ct. 1946, 1957-58, 60 L.Ed.2d 560]. Furthermore, "Congress is deemed to know the ... judicial gloss given to certain language and thus adopts the existing interpretation unless it affirmatively acts to change the meaning." Florida National Guard v. FLRA, 699 F.2d 1082, 1087 (11th Cir.), cert. denied, 464 U.S. 1007 [104 S.Ct. 524, 78 L.Ed.2d 708] (1983).
 See also 2A Sutherland, Statutory Construction Sec. 49.09 at 400 (4th ed. 1984).
 
 
 [7]
 The NRC argues that construction of the word "fee" as used in COBRA should not be controlled by cases construing the IOAA. (As I have already stated, with that much I agree. But that is not to say that the decisional law under the IOAA is entirely irrelevant to determining what Congress meant by terms, such as "regulatory service," that seem inherently to be terms of art.) Instead, the NRC cites us to a very different judicial gloss of the word "fee" found in the context of intergovernmental tax immunity. See NRC Brief at 40 n. 29. There, the NRC suggests, "where the distinction between a fee and a tax is all-important, the Courts have applied a different standard for fees, one much closer to that embodied in COBRA than the IOAA standard." Id. But the Supreme Court case to which the NRC cites us, Massachusetts v. United States, 435 U.S. 444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978), lays down a three-pronged test that includes as one of its elements the requirement that a fee be "based on a fair approximation of use of the system." Id. at 466-67, 98 S.Ct. at 1166-67. That part of the analysis is, as we have seen, lacking in the interpretation that the NRC now defends before us
 Thus, the requirement that fees be tied to specific benefits is a requirement of fee statutes generally; it is not an IOAA idiosyncracy. Indeed, I am aware of no case (and we are cited to none) interpreting a fee statute in which the requirement of a nexus between costs and benefits has not been imposed. See, e.g., In re Jenny Lynn Mining Co., 780 F.2d 585 (6th Cir.), cert. denied, 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986); City of Vanceburg v. FERC, 571 F.2d 630 (D.C.Cir.1977), cert. denied, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 108 (1978); see also Gillette & Hopkins, Federal User Fees: A Legal and Economic Analysis, 67 BOSTON U.L.REV. 795, 843 (1987) ("Insofar as authorizations such as those conferred on the NRC disavow any linkage to particular benefits ... any relationship between fees imposed and appropriate levels of services provided may be wholly coincidental. The user fee in this situation becomes largely a revenue-raising device imposed on particular recipients of government services. Such a device, although denominated a charge or user fee, is in essence a redistributional tax.").
 Metaphysical arguments as to the distinction between a tax and a fee aside, it is critically important as a matter of statutory interpretation that Congress chose to enact a user fee (rather than purport to delegate authority to tax).
 
 
 [8]
 The Supreme Court has warned time and again about the manifest dangers of resorting to legislative history. (Perhaps most noteworthy of late are recent Court opinions authored by Justices Marshall and Scalia suggesting the irrelevance of legislative history. See Burlington N. R.R. v. Oklahoma Tax Comm., --- U.S. ----, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987); United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., --- U.S. ----, 108 S.Ct. 626, 634, 98 L.Ed.2d 740 (1988).) And those dangers are, of course, at their height when repair is had to post-enactment statements by legislators
 Without abandoning those well-established concerns, I note by way of modest defense of my invocation of Senator Simpson's statements that Congress has of late been passing smorgasbord measures of distinctly substantive bite in omnibus pieces of appropriations legislation. After the dust settles, questions then have to be sorted out, sometimes in court. The recent action of the political branches with respect to the future of the ownership of the Boston Herald provides an instructive case in point. It may well be, then, that if legislative history is to be used (inconsistently with the sound practice of our English counterparts), then the courts should not close their eyes to what may well be, in practical terms, the only legislative history available if Congress proceeds to conduct its business in accord with more recent procedural innovations.
 
 
 [9]
 Like my colleagues, I sympathize with the short time within which the NRC was required to promulgate its rule, maj. op. at 770. As NRC Chairman Zech said with respect to the proposed rule, it was "the best the staff can do at this time." 51 Fed.Reg. at 24,087; J.A. 401. Nonetheless, those constraints are insufficient to justify adoption of a rule that is contrary to law. And, with the inestimable benefit of hindsight, we now know that the agency can do better
 
 
 [10]
 The Commission itself expressed doubts about the constitutionality of COBRA. In its July 1986 report to Congress, the Commission stated:
 [A]dditional clarifying legislation should be proposed because the standards set forth in [COBRA] are unclear. ... Because it appears that the lack of clear statutory language that definitively distinguishes [COBRA] from the IOAA, the legal problems identified by the Supreme Court in distinguishing the IOAA fees from taxes may be also present in [COBRA].
 Accordingly, the Commission recommends that the Congress enact clarifying legislation....
 J.A. at 445.
 When Congress then turned a deaf ear to the Commission's entreaties, the NRC responded by, in effect, throwing up its hands and leaving it to the courts to strike down the regulations.
 
 
 [11]
 See also Industrial Union Department, AFL-CIO v. American Petroleum Institute, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (adopting a narrowing construction in the course of holding invalid the agency's promulgation of standards); L. TRIBE, AMERICAN CONSTITUTIONAL LAW, Sec. 5-17 at 366 n. 15 (1988):
 Exercises of general taxing power are, as a practical matter, not susceptible to ordinary methods of judicial review. See generally Ely, Legislative and Administrative Motivation in Constitutional Law, 79 YALE L.J. 1205, 1235 (1970). The same discretionary character of taxation that ordinarily shields it from effective judicial review would also make legislative oversight of a delegate difficult. Therefore, it seems likely that the taxation power, if it is to be exercised legitimately, may be exercised only by Congress itself.
 
 
 [12]
 Indeed, the court's treatment of the benefit analysis is troubling in another way as well. The court holds that there is "no requirement that these generic costs must be reduced by a portion artifically allocated to public benefit, so long as the fees charged are 'reasonably related' to services provided the feepayers and do not exact payment for an independent public benefit. See Central & S. Motor Freight, 777 F.2d at 729." Maj. op. at 769-70 (emphasis in original). But there is nothing in the record to indicate that the agency made any effort to isolate fees that amounted to a payment for an independent public benefit
 
 
 [13]
 APL interprets our cases under the IOAA to adopt the following rule for analyzing the benefit conferred on the utility:
 The NRC's annual fee is improper if it is not a "reasonable approximation" of costs to provide special benefits to individual recipients, and is invalid to the extent the NRC's fee "unreasonably exceeds the value of the special services for which it is charged." NCTA II, 554 F.2d at 1106. The fee is also improper unless it is equivalent, "or at least proportionate to," the value of the benefit conferred, City of Vanceburg v. FERC, 571 F.2d 630, 643 (D.C.Cir.1977), cert. denied, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 108 (1978); the fee must be reasonably related to the individual costs of services and to the total costs for particular segments of recipients. NCTA II, 554 F.2d at 1108.
 APL Brief at 31.
 
 
 [14]
 The Court characterizes petitioners' contention that there must be a nexus between fees charged and benefits received as a " 'fairness' argument" and notes with strong approval Commission attempts to revise the fee schedule. Maj. op. at 770. Similarly Commissioner Zech, in his statement of separate views published with the Notice of Proposed Rulemaking, urged the Commission to "move toward an annual charge which would take into account, first, the amount of electricity produced by each licensee and, second, the resources which are expended by the Commission which fairly reflect the cost to the Commission of providing inspection and other services to the licensee." 51 Fed.Reg. 24078, 24087 (Jul. 1, 1986); J.A. at 401. What my colleagues and Commissioner Zech characterize as a matter of "fairness" or "sound policy," however, I believe is statutorily mandated
 
 
 [15]
 NRC protests that it duly considered and rejected in reasoned fashion comments suggesting that the fee should be based on the power rating in thermal megawatts for each reactor. But the NRC's response to that suggestion was strictly in terms of cost to the NRC and the ability of licensees to pay; there was no analysis with respect to the benefit to licensees. J.A. at 702
 In choosing the per capita approach rather than the megawatt approach in its initial Notice of Proposed Rulemaking, the Commission stated that "the Commission has selected [the per capita approach] for the proposed rule because there is no clear correlation between reactor size and NRC regulatory costs." J.A. at 397.
 
 
 [16]
 In 1985, the 90 nuclear power reactors in the United States ranged in size from 165 to 3,833 thermal megawatts. Inspection, licensing, and individual operator fees for these reactors ranged from $27,997 to $523,172. J.A. at 643-46